# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 8, 2011

No. 10-60817

Lyle W. Cayce
Clerk

JENNIFER FRENSLEY,

Plaintiff-Appellant

v.

NORTH MISSISSIPPI MEDICAL CENTER, INC.,

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:09-CV-118

Before KING, DAVIS, and GARZA, Circuit Judges.

PER CURIAM:[*]

Jennifer Frensley appeals the summary judgment dismissal of her quid pro quo sexual harassment suit against her former employer, North Mississippi Medical Center (NMMC), and supervisor, Michael Denham, after her position as the nurse manager of the ICU was eliminated and NMMC failed to hire her as the nurse manager in one of two replacement units. We agree with the district court that the summary judgment evidence failed to demonstrate a

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-60817

nexus between any sexual harassment and the defendants' personnel decision. For the following reasons, we therefore affirm the district court's decision.

I.

Jennifer Frensley (Frensley) began working at NMMC as a staff nurse in 1991. In 2005, she began working with Michael Denham (Denham), who was the Operating Room Director and Surgical Service Line Administrator. Denham offered Frensley the opportunity to become the nurse manager of the short stay holding area. In June or July of 2006, he approached her to take over as the nurse manager of the recovery room as well. Denham then promoted her to become the interim nurse manager of the ICU in December 2006, and she became the permanent nurse manager in April 2007.

In August 2007, NMMC became concerned that too many ICU patients were being diverted to other hospitals because of understaffing. NMMC created a task force, which included Denham, to study the issue. In August 2007, Frensley suggested that the ICU be split into a medical and a surgical division. Around the same time she also tendered her resignation, expressing her frustration with the continuing problems in the ICU. To convince her to stay, Denham and Charles Stokes, NMMC's president, agreed to provide Frensley with a personal assistant.

Staffing problems in the ICU persisted, as did the serious loss of ICU patients to other hospitals. Frensley and Denham spoke on multiple occasions about her frustrations in the ICU, and in February 2008 she told him she was at a "crossroads" with the position. On or about March 4, 2008, Stokes informed Donna Lewis, an administrator and task force member, that the ICU would be divided and that she (Lewis) would be the administrator over the new Medical ICU (MICU) and Denham would be the administrator over the new Surgical ICU (SICU).

No. 10-60817

On March 12, 2008, Frensley called Denham as she was leaving work to update him on the number of patients and the nurse-to-patient ratio. Later that evening, Denham called Frensley at home. This call is the core evidence that Frensley relies on to establish that she was the object of sexual harassment by her supervisor, Denham. During the call they initially discussed work, particularly whether the ICU would have to divert patients to other hospitals that night. Denham told Frensley he was considering leaving the hospital, and they discussed Frensley's "crossroads"–she was still under a lot of stress and considering returning to school for a master's degree.[1] Denham also asked Frensley why she always called him "sir" instead of "Mike" and why she was always so uptight. Frensley described the phone call as follows:

> [H]e asked me if I--why I just couldn't relax. He said, Jenny, you are always so uptight. Why can't you relax? Why don't you come over and have some beers with me, have some wine with me and we can sit out here on the deck. It is a beautiful sunset. I am watching the boats go down the Tenn-Tom, a very sultry type voice. I let him know after a few minutes I am sitting there and it is dawning on me that I felt like this man was asking me to come over for more than just a casual come over.

When she declined the invitation, Denham asked her to come and bring her children, but she still refused. Frensley testified in her deposition that Denham's behavior toward her changed after that phone call. Denham went from visiting her unit 4-5 times a day to visiting it rarely or not at all. She did not report the phone call to NMMC.

The next day, March 13, Stokes sent an email instructing Denham, Lewis, and George Hand (another administrator) to submit a plan to provide for the selection of "new leadership" for the ICU. They responded on March 18 by presenting a plan recommending that nurse managers be chosen through an

---

[1] In fact, she applied to graduate school in February or March.

3

interview process conducted by a team.  On April 18, 2008, five weeks after the phone call, the ICU was split into a surgical and a medical division.  Denham and Lewis held a meeting with Frensley, her assistant, and the ICU charge nurses to inform them of the division and the creation of two new nurse manager positions.

In her deposition, Frensley testified that a few days after the split Denham told her not to apply for either new position because it would do her no good as she would not be hired.  In his deposition, Denham said that he had the power to give Frensley the position when the split was announced but did not do so because of her previous stress-induced resignation and Stokes's desire for the committee to choose "new leadership."  Frensley testified that she spoke to Denham on April 21, and told him that she believed he was eliminating her position in retaliation for the fact that she had declined his March 12 invitation.  According to Frensley, he informed her that she could apply for a staff nurse position.

Frensley stated in her deposition that she met with Dillard, the director of employment services, on April 21, 22, and 23, 2008 and expressed her frustration about not being offered the new position. She reported no unwelcome or inappropriate conduct by Denham.  Frensley then began a scheduled two-week vacation, during which time the two new positions were posted. At the end of her vacation, Frensley applied for FMLA leave due to stress.

On May 9, during her FMLA leave, she met with Rodger Brown, the Vice-President of Human Resources.  Frensley told Brown that Denham had shown sexual interest in her since they began working together in 2005.  She told Brown that Denham once moved her hair behind her ear in 2005; he often made comments about how she could improve her hair, clothes, and make-up; and he invited her out for drinks or dinner on several occasions in the presence of other

No. 10-60817

people.[2] These remarks and invitations occurred intermittently from 2005-2008. This was the first and only complaint Frensley lodged against Denham for making unwelcome sexual advances.

Brown asked Frensley to make a written complaint and provide him with documentation of the March 12 phone call, but Frensley never did so. Brown investigated and again sought documentation from Frensley in August 2008. In September he wrote to inform her that he was unable to substantiate her harassment claim. Meanwhile, Frensley had been accepted into a master's program in June 2008, and she went to work part time at a different hospital.

Frensley brought suit alleging that her failure to be awarded the new nurse manager position rendered Denham and NMMC liable under various theories. Following discovery, the district court granted summary judgment in the defendants' favor.[3] Frensley appeals that order only with respect to the dismissal of her quid pro quo sexual harassment claim against NMMC.

## II.

We review a grant of summary judgment de novo "under the same standards as that applied by the district court. Summary judgment is required when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."[4]

---

[2] Frensley offered deposition testimony from two coworkers who testified that they witnessed Denham make similar comments, and one of them stated that she had heard him issue invitations for dinner and drinks to Frensley.

[3] Frensley named Denham in the action alleging a single cause of action for malicious interference with employment. As Mississippi does not recognize that tort, the district court treated the allegation as one of tortious interference with contractual relations and in a separate order dismissed this claim. Frensley does not appeal that order.

[4] *Ellert v. University of Texas*, 52 F.3d 543, 545 (5th Cir.1995).

No. 10-60817

III.

Frensley's sole claim is that she was denied the SICU nurse manager position because she refused Denham's invitation to come to his home for drinks on March 12, which amounted to quid pro quo sexual harassment. To establish a quid pro quo harassment claim, a plaintiff must show a causal nexus between the acceptance or rejection of a supervisor's "sexual harassment" and a resulting "tangible employment action."[5]   We have defined "unwelcome sexual harassment" as "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee."[6]  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[7]

The district court based its summary judgment on Frensley's failure to establish a causal connection between her rejection of Denham's invitation to his home and the hospital's elimination of her position as the ICU nurse manager and refusal to hire her as the new SICU nurse manager. We follow the same course. Although the primary incident–Denham's invitation to his home on March 12–standing alone would probably not amount to sexual harassment, it becomes a closer question when we consider the additional evidence of his sporadic comments about her appearance and clothing, and the one incident in which he touched her hair. These incidents, which occurred outside the

---

[5] *La Day v. Catalyst Tech., Inc.,* 302 F.3d 474, 481 (5th Cir. 2002)

[6] *Marquez v. Voicestream Wireless Corp.*, 115 F.App'x 699, 701 (5th Cir. 2004) (internal quotation marks omitted).

[7] *La Day*, 302 F.3d at 481-82 (internal quotation marks and citation omitted).

No. 10-60817

limitations period, can at most be considered as background information to provide context for the March 12 phone call.

As the district court noted, Frensley's only evidence of causation were the temporal proximity of Denham's invitation to the decision to replace her as nurse manager and her own belief.  In *Russell v. University of Texas of the Permian Basin*, we stated that "[t]hough we have often held that evidence of close temporal proximity can serve as proof of causation for retaliation claims, *see, e.g., Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir.2001), we have never used such evidence as proof of causation for quid pro quo claims.  Some of our sister circuits have accepted temporal proximity as proof of causation in quid pro quo cases, but we need not reach this issue in this instance."[8]

We agree with our sister circuits that temporal proximity evidence can be considered along with other circumstances in deciding causation.[9]  And considering the temporal proximity (approximately 5 weeks between the invitation and elimination of her position) along with other evidence in the case, we conclude that evidence does not raise an issue of material fact as to causation.

The hospital had persistent problems with the ICU that were causing it to lose business.  These problems and the frustration they created caused such stress that Frensley tendered her resignation at least once and told Denham on several other occasions that she was at the "crossroads" of resigning.  She

---

[8]  *Russell v. Univ. of Texas of the Permian Basin* 234 F.App'x 195, 202 (5th Cir. 2007).

[9] *See Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (finding a genuine fact issue as to causation based on close temporal proximity and other evidence in a quid pro quo case); *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1232 (11th Cir. 2006) (stating in dicta that temporal proximity can give rise to a genuine issue of material fact as to causation in a quid pro quo case); *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 285 (3d Cir. 2000) (using temporal proximity evidence in evaluating the causal nexus at the summary judgment phase in a quid pro quo case).

No. 10-60817

frequently told Denham she wanted to return to school for her master's degree, and she applied to graduate school in February or March of 2008.

Stokes, the hospital president, informed Lewis that the ICU would be split into two divisions on March 4, 2008. That decision was clearly unrelated to Denham's invitation to Frensley, which took place eight days later. Stokes informed Denham and other hospital administrators on March 13 that they needed to come up with a plan for "new leadership" in the divided units, which included new nurse managers. The task force members he appointed recommended filling the positions after a team conducted interviews, which is the process the hospital adopted. Stokes also made it clear from his affidavit that he wanted new leadership in those two positions.

In sum, Frensley's argument that the somewhat equivocal telephone call of March 12, 2008 from Michael Denham (which we assume without deciding amounted to sexual harassment) was causally related to the refusal of the hospital to offer her the new SICU position is based almost exclusively on the temporal proximity of the incident and her subjective belief that the two events are related. This argument is undermined by a number of uncontested facts: (1) the decision to split the ICU department into two units had been made before the March 12 telephone call; (2) the President of NMMC, Stokes, told Denham he wanted new leadership in the management of the ICU; and (3) Denham had a plausible reason not to offer the position to Frensley, who had made clear both her dissatisfaction with the job and her desire to return to school for a master's degree.

We therefore agree with the district court that the summary judgment evidence does not support an inference that the hospital declined to offer one of the new nurse manager positions to Frensley because she declined Denham's March 12 invitation to have drinks at his home.

8

No. 10-60817

## IV.

We therefore AFFIRM the district court's judgment.