# United States Court of Appeals
## For the First Circuit

No. 11-2143

MELISSA S. GERALD,

Plaintiff, Appellant,

v.

UNIVERSITY OF PUERTO RICO; EDMUNDO KRAISELBURD,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella, Howard, and Thompson,
Circuit Judges.

Bámily López Ortiz, with whom López Toro, Estudio de Derecho & Notaría, Lizabel M. Negrón-Vargas, and Rivera & Fernandez-Reboredo were on brief, for appellant.
Raquel M. Dulzaides, with whom Mayra González Reyes, J. Ramón Rivera-Morales, and Jiménez, Graffam & Lausell were on brief, for appellee University of Puerto Rico.
Jesús R. Morales Cordero, with whom González Castañer & Morales Cordero, PSC was on brief, for appellee Edmundo Kraiselburd.

January 28, 2013

**THOMPSON**, <u>Circuit Judge</u>. Dr. Melissa S. Gerald, a scientist formerly employed by the University of Puerto Rico ("University"), says she was sexually harassed by her supervisor, Dr. Edmundo Kraiselburd. Gerald reported the harassment and this protestation, according to her, led the University to retaliate against her. Gerald sought redress in district court, suing Kraiselburd and the University for violating Title VII of the Civil Rights Act and Puerto Rico law. The court granted summary judgment in favor of the defendants, dismissing the complaint in its entirety. Gerald appealed. After due consideration, we affirm the grant of summary judgment in part and vacate in part.

## FACTUAL BACKGROUND

These facts are outlined in a light most favorable to the non-movant, Gerald. <u>See</u> <u>Pérez-Cordero</u> v. <u>Wal-Mart Puerto Rico, Inc.</u>, 656 F.3d 19, 20 (1st Cir. 2011).

### A. The Setting and People

The Medical Sciences Campus is an institutional unit of the University. Within the Medical Sciences Campus is the Caribbean Primate Research Center ("CPRC"), a research, training, and education center for the study of non-human primates. The CPRC is made up of four integrated facilities: the Cayo Santiago Field Station ("Cayo Santiago"), the Sabana Seca Field Station, the Laboratory of Virology and Genetics, and the Laboratory of Primate Morphology and Genetics. Most relevant here is Cayo Santiago, a

-2-

forty-acre island located less than a mile off the coast of Puerto Rico. There hundreds of monkeys live in semi-natural conditions for the purpose of conducting behavioral and non-invasive biomedical research.

During the time frame important to us, Kraiselburd (with the University in different capacities since 1977) was the Principal Investigator and Director of the CPRC, as well as a Professor of the Medical Sciences Campus. His role with the CPRC meant that he oversaw and supervised the operation of its four integrated facilities. Gerald (hired in 2001) had a dual role as "Scientist in Charge" of Cayo Santiago and as an Assistant Professor at the Medical Sciences Campus, a tenure track position which contemplated her advancement to Associate Professor. As Scientist in Charge, Gerald's duties included running the daily operation of Cayo Santiago, maintaining a computerized database of the monkey population, managing personnel, participating in animal trapping, conducting research, preparing reports and grant proposals, and assisting visiting scientists. Gerald's home base of operation was Punta Santiago, the mainland village closest to Cayo Santiago. Her supervisor was Kraiselburd.

## B. The Alleged Harassment

By all appearances Kraiselburd and Gerald worked together and were friends for a number of years without anything of note occurring. Then in 2005, at a conference in Cuba, the two

apparently engaged in a week-long sexual affair. According to Gerald, Kraiselburd insisted on pursuing the relationship when they returned home and Gerald, embarrassed by the fling, rebuffed him.

A couple years later, Gerald was approached by a film production company, which was producing a documentary about the life and work of prominent evolutionary biologist, E.O. Wilson. They wanted to bring Wilson for a visit to Cayo Santiago (a re-creation of his visit fifty years earlier) and film it. Gerald brought the request to the attention of various University personnel, not just Kraiselburd, and he was not pleased. Via email, he told Gerald that she needed to clear CPRC matters with him, as the director, before involving others. Kraiselburd accused Gerald of ignoring him except when money was needed and alienating people with her attitude. Gerald did not see what the big deal was, stating that she thought she was following protocol.

Despite these initial planning glitches the visit and filming went forward in mid-April 2007. As part of the festivities, a dinner was held on April 15, and Gerald gave Kraiselburd a ride from his hotel to the dinner. At the end of the evening, she dropped him back off at his hotel and, according to Gerald, Kraiselburd sexually propositioned her. She says he gestured at the hotel and referenced an offer being on the table, which Gerald took as an invitation to his room. Gerald, who had

-4-

her young daughter in the car, declined the solicitation. Gerald says she could tell Kraiselburd was angry with her refusal.

Gerald and Kraiselburd continued to clash the following month as they worked to make arrangements for more visiting scientists coming to Cayo Santiago. In email correspondence the two went back and forth about the visits' planning and Kraiselburd's frustration with Gerald appeared to grow. The heated exchange culminated with an email from Kraiselburd to Gerald dated May 24, 2007, in which Kraiselburd accused Gerald of not being dependable and also declared she was not the type of person needed at Cayo Santiago. He added: "We now have to formally talk. I think I will have to ask you to step down. And now I am dead serious. You will receive a letter shortly."

A few days later, on May 29, Gerald met with Kraiselburd in his office and attempted to smooth things over. Gerald says she apologized and Kraiselburd accepted. The two then said farewell with a hug and kiss on the cheek. As the embrace broke apart, Gerald says Kraiselburd grabbed her breast and made sexually suggestive grunting noises. Gerald was disgusted but said nothing for fear of losing her job.

A week or so later, on June 7, Gerald, Kraiselburd, and other co-workers attended a meeting to discuss an upcoming conference. During the meeting Gerald mentioned that she would be busy during the evenings of the conference because she had a friend

attending.  According to Gerald this led Kraiselburd to say something along the lines of: "What will it take for you to fuck me? Is this one of your girlfriends or one of your boyfriends?  If it is one of your girlfriends, I'll fuck both of you."  If it is one of your boyfriends, "I will be outside your hotel door peeking giving you directions how to fuck your boyfriend."  It is unclear from the record if or how Gerald responded.

Then, on June 12, Gerald and Kraiselburd lunched with another visiting scientist.  Gerald and Kraiselburd quarreled about whether she had done something he had asked her to do and when Gerald said she had to leave lunch early to get her daughter, Kraiselburd began questioning Gerald about what hours she actually worked.  Gerald, embarrassed at being questioned in this manner in front of a colleague, argued back in a raised voice and ultimately left the restaurant.

### C. Gerald's Job Responsibilities Change

The evening of the heated lunch exchange, Kraiselburd sent Gerald an email indicating that due to budget limitations Gerald would be removed from the position of Scientist in Charge by the end of the month.  And then a few days later, on June 18, Kraiselburd recanted.  He sent Gerald another email: after considering the situation at Cayo Santiago, it was decided Gerald would in fact retain her title as Scientist in Charge, but no more $800 a month bonus.  Gerald responded via letter to Kraiselburd,

lobbying for her bonus and requesting an in-person meeting to discuss matters.

Her plea fell on deaf ears and on June 29, Kraiselburd sent Gerald another letter.  After evaluating things at Cayo Santiago he wrote, it had been decided that a restructuring was needed.  Gerald was relieved of all administrative duties and colony management responsibilities.  To reflect these changes, her title was changed to Resident Scientist.  Her bonus was set at $200 a month.  It was not all bad news for Gerald though as she was promoted from Assistant Professor to Associate Professor at the Medical Sciences Campus a couple days later on July 1.  The promotion came with a $1,000 a month pay raise.

### D. The Complaint and Investigation

On August 3, 2007, Gerald met with the Chancellor of the Medical Sciences Campus, Dr. José R. Carlo Izquierdo, and other University personnel, to lodge an administrative sexual harassment complaint against Kraiselburd.  Gerald was emotional and crying, and apparently Carlo found her credible. Gerald was told that she should formalize her complaint in writing so that it could be investigated.  Gerald did so the next day.  An outside attorney, Maritza Miranda López, was brought in as the investigating officer and charged with looking into things and issuing a recommendation. After reviewing documentary evidence, including email communications, and interviewing Gerald, Kraiselburd, and a handful

of other University personnel, López issued her findings in a seventeen-page investigative report, dated October 22, 2007. We highlight the more pertinent findings.

Gerald had alleged three instances of sexual harassment to López: (1) the April 15, 2007 incident when Kraiselburd propositioned Gerald in the hotel parking lot, (2) the May 29, 2007 encounter where he grabbed her breast, and (3) the June 7, 2007 instance where Kraiselburd stated, among other things, "What will it take for you to fuck me?". Kraiselburd flatly denied the first two occurrences. As for the third, he admitted to making a comment of that nature but said it was a joke made in response to Gerald saying that she was going to "do it like rabbits" (or something to that effect) with her visiting friend.

The co-workers who were interviewed all painted a similar picture of Gerald and Kraiselburd's relationship. The general consensus was that the two appeared to have a close and trusting relationship, and their interactions often included off-color remarks and jokes of a sexual nature, many a time to the discomfit of some. None of the co-workers witnessed either of the first two acts of alleged harassment but co-workers James Ayala and Janet Rivera were at the June 7 meeting. Rivera said she heard Kraiselburd say "what would you do to be with me," at which time

she withdrew from what she perceived was a personal conversation.[1] Ayala thought Kraiselburd said something like "what will you pay to spend the night with me" in a joking manner. Ayala said this comment was in response to Gerald joking about the intimate nature of her relationship with her visiting friend.

Interviews were also conducted with some of the University personnel who Gerald had met with when she first lodged her complaint. One said Gerald reported that Kraiselburd had approached her with inappropriate comments and had "grazed" her breast. The other said Gerald made vague and somewhat unclear allegations about Kraiselburd touching her breast and making certain comments and invitations.

Aside from contradicting Gerald's claims about the three acts of alleged harassment, Kraiselburd also gave his take on why he restructured Gerald's position as Scientist in Charge. Gerald, he said, was shirking her job responsibilities, not adhering to her work schedule, mistreating personnel, and not respecting her superiors. More specifically, he claimed Gerald was not going to Cayo Santiago as often as needed, not charging researchers for bench and lodging fees, ordering employees to operate boats in

---

[1] Rivera claimed Gerald approached her prior to her interview and told Rivera to tell López that she had heard the word "fuck" and that it was offensive. Rivera told Gerald that was not what she heard and she would tell the truth. Gerald insisted that Rivera call her after the interview. Gerald was deemed by López to have attempted to influence Rivera's testimony.

dangerous conditions, misrepresenting her role at Cayo Santiago to the press, not satisfying job responsibilities resulting in others absorbing the tasks, and that she had profanely called an employee an asshole.

López reached her conclusions. She did not find Gerald credible and determined it unlikely that the hotel proposition or breast grabbing incident occurred. To the extent the latter had taken place, she found that the incident did not appear to impact or even matter to Gerald. As for the third incident, López's report noted that jokes and comments of a sexual nature were admittedly common for Gerald and Kraiselburd and it was unlikely Kraiselburd's wording was as crude as Gerald suggested. To the extent any of the incidents did take place, they were deemed not severe or offensive enough to alter Gerald's work conditions. The changes in Gerald's job, López concluded, were strictly performance related.

López's report ended with recommendations. Despite her not buying Gerald's story, she recommended that an administrative hearing be commenced. López suggested that if the administrative hearing officer reached the same conclusions she had, then the University should consider filing administrative charges against Gerald. She also advised the University to instruct both Gerald and Kraiselburd about the inappropriateness of using obscene language at work. Finally, citing Gerald's reported non-compliance

with her duties and the animosity that had arisen as a result of this investigation,[2] López recommended that Gerald's post be relocated away from Cayo Santiago.

## E. The University Responds

Armed with López's findings, the University, via a resolution dated November 8, 2007 and issued by Chancellor Carlo, dismissed Gerald's sexual harassment complaint. The resolution further indicated that administrative proceedings would be instigated against Gerald to determine whether she had violated University regulations by breaching her job duties or filing a false grievance. Also, in accordance with López's recommendation, the resolution decreed that Gerald be transferred to another CPRC facility, the Laboratory of Primate Morphology and Genetics (the "Laboratory"). Gerald's transfer to the Laboratory was memorialized in a December 4, 2007 letter from Kraiselburd. In that same letter, Gerald's title Resident Scientist was changed to Staff Scientist.

---

[2] The report referred not only to the animosity between Kraiselburd and Gerald but between Gerald and Ayala. It seems Ayala and Gerald had got into an argument after he caught her reading his sworn statement to López when it was left open on his computer screen. Ayala claimed that Gerald, who countered with her own charge of computer snooping against him, was openly hostile after this.

-11-

## F. Gerald Responds

Refusing to roll over Gerald appealed the dismissal of her sexual harassment complaint to the University president.[3] As a result of the appeal, the chancellor stayed the administrative proceedings against Gerald. Gerald then filed a sexual harassment complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC dismissed the complaint and issued a right to sue notice on June 23, 2008.

On June 26, 2008, Gerald voluntarily resigned from the University via a letter to Chancellor Carlo. She accused Carlo of mishandling the investigation and wrongly believing Kraiselburd over her. Gerald claimed that she had been unfairly demoted and that there was no work for her in her new position. She also complained that her new job at the Laboratory (which was not in the same area as Cayo Santiago) had added time to her commute forcing Gerald to sacrifice time with her daughter. Gerald lamented that her career had been derailed and said she was seeking help for clinical depression. Gerald's last day with the University was August 2, 2008. That same month she started working for the National Institute of Health (located in Maryland) and was not unemployed at any time after her departure.

---

[3] As of the time the district court issued its decision, a hearing had been held on Gerald's appeal but no decision had been issued.

-12-

## PROCEDURAL HISTORY

A few months after leaving the University, Gerald brought this lawsuit against the University and Kraiselburd. The complaint alleged that she was sexually harassed by Kraiselburd (and that the University should be held liable for this conduct), retaliated against by the University for filing the administrative sexual harassment complaint, and constructively discharged, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. Gerald also raised supplemental Commonwealth claims under: (1) Law 17 (prohibiting sexual harassment in employment), P.R. Laws. Ann. tit. 29, § 155; (2) Law 69 (prohibiting gender based employment discrimination), id., § 1321; and (3) Law 100 (analogous to Title VII), id., § 146. She sought back pay, compensatory and punitive damages, and attorney's fees and costs.

In lieu of an answer, the University and Kraiselburd filed a joint motion to dismiss. It was granted in part, resulting in the dismissal of multiple claims, which Gerald does not appeal. What remained was Gerald's Title VII claim against the University, as well as her Law 17 and Law 69 state law claims against Kraiselburd. The case proceeded to the discovery phase, with a trial date slated for March 2011.

Shortly before trial, the University and Kraiselburd jointly moved for summary judgment on all remaining claims. The

district court granted the motion, dismissing with prejudice the complaint in its entirety. In short, the district court found that Gerald failed to make out a prima facie case for any of the relief she sought. More specifically, it said Gerald could not show that Kraiselburd's conduct was severe or pervasive; that her employment hinged on her acceptance of Kraiselburd's sexual advances; that she suffered an adverse employment action; or that her work conditions were so oppressive that she was forced to resign. The court added that even assuming the steps taken by the University (i.e., filing administrative charges, transferring Gerald) constituted adverse employment actions, there was no causal connection between those actions and Gerald's filing of the administrative complaint and the University had valid, non-pretextual reasons for what it did.

Gerald now appeals. Arguing that the district court usurped the jury's function by improperly weighing evidence, making credibility determinations, and disregarding controversies in the summary judgment record, she asks us to reverse.

## STANDARD OF REVIEW

Our review is de novo. Martínez-Burgos v. Guayama Corp., 656 F.3d 7, 11 (1st Cir. 2011). In taking a fresh look, we draw all reasonable inferences in favor of Gerald, as the non-movant, and we view the record in a light most flattering to her. Id. Summary judgment is called for when "there is no genuine issue as to any material fact and the moving party is entitled to judgment

as a matter of law." Id.; see Fed. R. Civ. P. 56(a). A genuine issue is one that can "be resolved in favor of either party" and a material fact is one which "has the potential of affecting the outcome of the case." Pérez-Cordero, 656 F.3d at 25.

"Summary judgment is not appropriate where 'the evidence on record is sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side.'" Id. (quoting Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 782 (1st Cir. 2011)). The burden is on Gerald to show us that this is the case; she must point to specific and competent evidence to support her claims. See Ayala-Sepúlveda v. Municipality of Germán, 671 F.3d 24, 30 (1st Cir. 2012).

## TITLE VII CLAIMS

Title VII makes it unlawful for employers to discriminate based on sex and further prohibits retaliation against those employees who oppose such discrimination. 42 U.S.C. § 2000e-2(a)(1); id. § 2000e-3(a). The Title VII claims that Gerald is pursuing against the University are: sexual harassment (both hostile work environment and quid pro quo), retaliation, and constructive discharge. We take them in sequence.

## A. Sexual Harassment

Sexual harassment qualifies as sex-based employment discrimination in violation of Title VII. Pérez-Cordero, 656 F.3d at 26. Before us, as she has all along, Gerald alleges three

-15-

instances of harassment by Kraiselburd: (1) the April 15, 2007 hotel parking lot proposition incident, (2) the May 29, 2007 breast grabbing encounter, and (3) the June 7, 2007 comment about engaging in sexual relations made during a staff meeting.  For summary judgment purposes, the University is not disputing that these instances occurred.

### i. Hostile Work Environment

Requiring a person "'to work in a discriminatorily hostile or abusive environment'" violates Title VII.  Valentín-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 94 (1st Cir. 2006) (quoting Harris v. Forklift Sys., 510 U.S. 17, 21 (1993)). To prevail on a hostile work environment sexual harassment claim, a plaintiff must establish in essence: (1) membership in a protected class and (2) unwelcome sexual harassment, (3) which was based on sex, (4) was sufficiently severe or pervasive, (5) was objectively and subjectively offensive, and finally (6) that some basis for employer liability has been established.  Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 228 (1st Cir. 2007).  We take this six element test in order.

We need not spill much ink on the first.  There is no doubt (and no dispute from the University) that Gerald, as a woman, is a member of a protected class.  We move on to the unwelcomeness inquiry.

-16-

The district court found that there was a factual question as to whether Kraiselburd's conduct was unwelcome. Apparently for this reason the University does not address this issue on appeal, though it did argue this point below. It primarily argued that Gerald's own conduct, namely her voluntarily engaging in off-color banter of a sexual nature with Kraiselburd, showed that his conduct was not unwelcome. This argument does little to convince. We fail to see how an employee telling risqué jokes means that she is amenable to being groped at work. Instead the evidence here was enough, at the very least, to raise a factual question as to whether Kraiselburd's conduct was unwelcome. Gerald did not accept his invitation to her hotel room; she turned him down. Gerald informed López during the administrative investigation that she was bothered by Kraiselburd's proposition. There is no evidence that Gerald encouraged or invited Kraiselburd to grab her breasts and she indicated during the investigation that she was disgusted and bothered by him doing so. Similarly there is no evidence that Gerald welcomed the comments made during the staff meeting even if she indeed mentioned the intimate nature of her relationship with another person. In the context of sexual harassment claims, the question of "whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of

fact," and this case is no exception. <u>Meritor Sav. Bank, FSB</u> v. <u>Vinson</u>, 477 U.S. 57, 68 (1986).

The University did not argue below, or to this court, that the harassment was not based on sex and the district court deemed this factor uncontested. Our review being de novo and not limited to the district court's reasoning, we shall address this factor nonetheless. For harassment to be based on sex it need not be an act motivated by sexual desire but rather the harassment must be gender specific. <u>Pérez-Cordero</u>, 656 F.3d at 28. Here the record contained sufficient evidence from which a reasonable jury could conclude that Kraiselburd's actions were triggered by Gerald's gender. Kraiselburd sexually propositioned Gerald, grabbed her breasts, and made comments about engaging in sexual relations with her; it is reasonable to conclude that these actions were connected to Gerald being a woman.

We proceed to the real bone of contention here - whether the harassment was sufficiently severe or pervasive. This is the factor the district court found lacking and it is also the entire focus of the University's argument on appeal. This is not surprising given that there is seldom a defensible purpose behind discriminatory harassment and the real question is typically whether the bad acts taken in the aggregate are sufficiently severe or pervasive to be actionable. <u>Noviello</u> v. <u>City of Boston</u>, 398 F.3d 76, 84 (1st Cir. 2005). There is no mathematically precise

test that we employ to answer this question but several factors, none of which are individually determinative, are relevant: the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance. Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 73-74 (1st Cir. 2011).

Pointing to the fact that Gerald and Kraiselburd often engaged in off-color banter, the University says the supposed harassment was not severe. We disagree and think a jury could have seen things otherwise. Gerald says Kraiselburd grabbed her breasts, sexually propositioned her, and crassly asked in front of others why she would not have sex with him. The University is not denying these occurrences for summary judgment purposes. These offensive incidents, which involved sexual propositioning and uninvited touching, can reasonably be viewed as severe; and, in the case of the breast grabbing incident, physically threatening (not to mention criminal). Like we have said, it is clear that "behavior like fondling, come-ons, and lewd remarks is often the stuff of hostile work environment claims . . . ." Billings v. Town of Grafton, 515 F.3d 39, 48 (1st Cir. 2008) (gathering cases). This is precisely the type of conduct we have here.

On the frequency front, the University likens what happened to a brief three-incident blip in an otherwise uneventful six years of working together. We are not convinced. Though

Gerald has alleged just three acts of harassment, a "single act of harassment may, if egregious enough, suffice to evince a hostile work environment." Noviello, 398 F.3d at 84 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). The incident in which Kraiselburd grabbed Gerald's breasts and made sexually suggestive noises comfortably qualifies as egregious. And Gerald has alleged two incidents on top of this.

A closer question is whether the three incidents interfered with Gerald's work performance. The University says they did not, making much ado of cordial and sometimes joking emails that Gerald sent Kraiselburd after each of the three instances. But these emails do not give us a great deal of pause. The fact that Gerald managed to get work done despite Kraiselburd's actions is not fatal to her hostile work environment claim. See, e.g., Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 40 (1st Cir. 2012) (holding that a jury's hostile work environment liability finding was not precluded just because the plaintiff neurosurgeon managed to get her work done despite being harassed by her supervisor); Billings, 515 F.3d at 51 (finding that the plaintiff secretary being able to perform her job despite her boss leering at her breasts did not doom her hostile work environment claim). The University also points to a couple of lines in Gerald's deposition where she admits telling some visiting scientists that she could work with Kraiselburd and wanted to repair things with him.

-20-

However, there is no surrounding frame of reference for this comment leaving us with no idea when Gerald made this statement or the context in which it was made. Therefore we do not put too much stock in this remark.

Gerald, for her part, does not give us much more as to how the incidents affected her work performance. She refers in her formalized sexual harassment complaint to being unable to "work effectively" and to her work productivity being affected but does not elaborate beyond this.[4] And although Gerald did seek psychiatric counseling for depression, there is no evidence that Gerald's work performance suffered as a result of this depression. See Bhatti, 659 F.3d at 74; see also Ayala-Sepúlveda, 671 F.3d at 31. But in the end, subject to some policing on our part, "it is for the jury to . . . decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment." Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 19 (1st Cir. 2002) (internal quotation marks and citation omitted). And, as we said, none of

---

[4] Gerald did offer some evidence about how her complaining about the harassment and her transfer to the Laboratory interfered with her work performance. In a follow-up email to University personnel Gerald said that since she filed the administrative complaint, Kraiselburd was intentionally keeping her out of the loop on decisions he was making, which affected her ability to do her job. Gerald also testified at deposition, and complained to University personnel via letter, that she had no duties and could not perform her science in her new role at the Laboratory. However, how Gerald's filing of the complaint and transfer might have affected her employment strikes us as a separate issue from how the alleged incidents of harassment impacted her work.

-21-

the considerations that go into the severe and pervasive inquiry are individually determinative. Though Gerald did not give us much to go on, policing is not warranted here, especially given the evidence we have as to the other considerations. To sum things up, taking the evidence in a light most favorable to Gerald, we think a reasonable jury could have found that the harassment was severe or pervasive.

We turn to, and conclude, with the final two factors in our hostile work environment analysis. The district court, having found that the harassment was not severe or pervasive, elected not to reach these factors. Again presumably for this reason, the University did not address them on appeal.

The next inquiry is whether the complained of conduct was objectively and subjectively offensive. Said another way, would a reasonable person find the conduct hostile and abusive and did the complainant in fact perceive it to be so. Billings, 515 F.3d at 47. On the issue of subjective offense there was adequate evidence: Gerald was bothered by Kraiselburd's invitation to his hotel room, disgusted by him grabbing her breasts, and she was depressed, seeing a psychiatrist, and taking anti-depressants. The fact that the complained of conduct involved non-consensual physical touching, an invitation for sexual relations, and embarrassing public comments strikes us as being sufficiently in the realm of what a reasonable person might find offensive. Gerald

presented enough evidence on this point to withstand summary judgment.

Establishing some basis for employer liability is Gerald's final hurdle. When it is a supervisor that creates an actionable hostile work environment, the employer is vicariously liable. Arrieta-Colón v. Wal-Mart Puerto Rico, Inc., 434 F.3d 75, 86 (1st Cir. 2006) (citing Faragher, 524 U.S. at 807); Torres-Negrón v. Merck & Co., 488 F.3d 34, 40 (1st Cir. 2007). Here it is undisputed that Kraiselburd was Gerald's supervisor with authority over her. Thus a basis for the University's liability has been established.[5]

This takes us to our ultimate conclusion. When reviewing a summary judgment grant like this one, our "function is one of screening, that is, to determine whether, on particular facts, a reasonable jury could reach such a conclusion." Noviello, 398 F.3d

---

[5] Before the district court, the University argued that because it had a well-established anti-harassment policy in place and because it took steps to correct any harassment on Kraiselburd's part, it was entitled to the Faragher-Ellerth defense. The Faragher-Ellerth defense, which shields an employer from liability for a supervisor-created hostile work environment, can only be raised if no tangible employment action is taken against the employee. Torres-Negrón, 488 F.3d at 40 fn.5; Arrieta-Colón, 424 F.3d at 86. The defense requires the employer to show by a preponderance of the evidence that it both "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998). Though it argued the Faragher-Ellerth defense below, the University did not assert it on appeal. Therefore we need not address this issue.

at 94. In other words, we patrol the outer bounds. <u>Vera</u> v. <u>McHugh</u>, 622 F.3d 17, 27 (1st Cir. 2010). Here, taking the evidence in a light most favorable to Gerald, we cannot decisively say (as the district judge did) that a reasonable jury could not conclude that she was subject to a hostile work environment. The court erred in granting summary judgment on Gerald's hostile work environment claim.

### ii. Quid Pro Quo

Quid pro quo sexual harassment is when a supervisor uses his superior position to extract sexual favors from a subordinate and, if rebuffed, retaliates by taking action that adversely impacts the subordinate's employment. <u>Valentín-Almeyda</u>, 447 F.3d at 93.[6] This type of harassment "can be shown where a supervisor uses employer processes to punish a subordinate for refusing to comply with sexual demands." <u>Hernández-Loring</u> v. <u>Universidad Metropolitana</u>, 233 F.3d 49, 52 (1st Cir. 2000).

Gerald claims that is precisely what happened here. Because she rejected Kraiselburd's sexual advances, she says he used his position to get her demoted from Scientist in Charge. The University counters that there is no evidence that Kraiselburd conditioned Gerald's continued employment on her accepting his

---

[6] The demarcation between this type of harassment and hostile work environment harassment is "of 'limited utility,' other than to generally describe alternative approaches to proving sex-based employment discrimination." <u>Pérez-Cordero</u>, 656 F.3d at 26 (quoting <u>Burlington Indus., Inc.</u>, 524 U.S. at 751).

advances and that Gerald's change in title stemmed from her non-compliance with her job responsibilities and insubordinate attitude. Gerald's response: the University is exaggerating, if not misrepresenting, the scope of her responsibilities and supposed non-compliance, and it is no coincidence that Kraiselburd started complaining about her performance right around the time she spurned him. She calls his complaint suspiciously inconsistent with earlier high praise of her. The district court, after reviewing the evidence, accepted the University's version of things. We are less convinced.

Sometimes in these quid pro quo cases the defendant superior does not mince words and the plaintiff employee is able to present direct evidence that the defendant threatened to exact retribution. See, e.g., Valentín-Almeyda, 447 F.3d at 96 (defendant police supervisor told the plaintiff officer she would be "screwed" if she did not react more affectionately to his advances); Hernández-Loring, 233 F.3d at 53 (defendant committee member boasted that he had caused the plaintiff professor to be passed over for a promotion because she would not date him); Bryson v. Chicago State Univ., 96 F.3d 912, 914 (2d Cir. 1996) (defendant provost told plaintiff professor that she would be sorry if she did not do what he said). We have nothing so crystalline here.

Instead we have references that Kraiselburd made via email the day before he propositioned Gerald in the hotel parking lot that could (as Gerald suggests) be read as part of his attempt to sexually proposition her or could (as the University suggests) be innocuous references to something else entirely. Specifically in one email Kraiselburd said: "Just relax. [You] live only once." In another, he tells Gerald: "Offer still on the table." Similarly ambiguous is an email exchange the day after the proposition in which Kraiselburd writes: "Sorry, I have to draw the line somewhere. Hope that you will be able to eat your own words without too much ketchup." As with the other emails, it is not entirely clear what Kraiselburd is referring to - Gerald's rejection the night before or something else. Construing the evidence and reasonable inferences in Gerald's favor as we must, it is plausible to read these emails to mean what she says they do, but we acknowledge we are getting close to speculative territory. Were this all Gerald had, it would likely not be enough to create a trial-worthy issue, but Gerald also presented a good amount of evidence rebutting the University's contention that she was demoted for job related reasons, as opposed to for rejecting Kraiselburd. We chronicle the evidence, starting with the University's.

One of the University's claims was that Gerald was not fulfilling her responsibilities as required by the grant under which the CPRC operated. In support, Kraiselburd offered a signed

declaration. In it he averred that Gerald failed to fulfill multiple job responsibilities, such as maintaining the colony's genetic data, billing fees, reporting and requesting authorization, and obtaining significant grant monies. He also claimed she did not conduct herself properly with other employees, did not maintain a physical presence at work, and that she displayed a disrespectful, insubordinate attitude. The University also presented an October 19, 2007 letter from the administrative director of the CPRC, José Alicea López, in which he indicated that as Scientist in Charge it was Gerald's responsibility to bill researchers various fees (e.g., bench and trapping fees) and that she was not fulfilling this function. López said an investigation revealed that since 2004 approximately $60,000 in fees went un-billed.[7] A follow-up administrative report put the number at $100,000.

The University also offered evidence about how Gerald comported herself at work. Administrative director López penned a May 18, 2007 letter where he complained that Gerald was requiring the CPRC's boat personnel to ferry her and others to Cayo Santiago in dangerous conditions and at irregular hours. A laboratory employee from Cayo Santiago, Rolando Viera, also wrote a letter

---

[7] It should be noted that the letter in which this assertion was made was penned by López after Gerald was demoted and, in fact, after she lodged her sexual harassment complaint. It is unclear how much Kraiselburd or the University knew about the allegations in this letter at the time Gerald was removed from her post as Scientist in Charge.

(dated May 12, 2007) in which he complained that the previous February Gerald had made an inappropriate joke of a sexual nature to him and called him a cabrón, the Spanish word for asshole.

The University also accused Gerald of being disrespectful and insubordinate with Kraiselburd.  It produced a slew of emails, some of which evidenced Gerald speaking to Kraiselburd (and he to her) in a brash manner.  Examples included Gerald saying: "Team work is all that I am asking for.  Since when did asking about the status of the genetics become a personal issue?  Ridiculous!!!"  Or when Kraiselburd criticized Gerald for handling a matter over email as opposed to on the phone, she responded: "Ask before you attack, remember? . . . I do not have a cell phone for work, so I did what I did!"  In another argument with Kraiselburd, Gerald said: "Your ego has played a very nasty trick on you."

Gerald countered with her own evidence, which she says puts things in a different light.  First, she claims that until she rebuffed Kraiselburd she received good marks for her performance. She presented an annual report issued on December 31, 2006 (about three and a half-months before the first instance of alleged harassment) by the Chancellor's Advisory Committee on the CPRC. The report indicated that overall "the Cayo Santiago program appears to be in excellent shape" and that Gerald was "doing an excellent job as Scientist-in-Charge in promoting both the CPRC and Cayo Santiago internationally, nationally and in Puerto Rico."

Gerald also produced a letter written by Kraiselburd in September 2006 when Gerald was initially evaluated for the promotion from Assistant to Associate Professor. In the letter, Kraiselburd offered his "highest recommendation" for Gerald's promotion and he heralded the pair's "excellent working relationship," stating that Gerald had "far exceeded any of our expectations."

Gerald also disagreed that she was not fulfilling her job responsibilities. Pointing to her personnel file and the CPRC operational grant, Gerald averred that her list of duties as Scientist in Charge was shorter than Kraiselburd said it was, and that the duties she was accused of neglecting were not actually hers to perform. Specifically with respect to the fee billing failure, Gerald says that assessing fees was a group effort and that it was López not her who was in charge of invoicing the fees. For support Gerald points to a document which she calls the CPRC's standard operating procedure, which does seem to support the proposition that she was not in charge of invoicing, though it is not totally clear what role she had in the billing team effort.[8] In her deposition Gerald also testified that while she was Scientist in Charge it was very unclear who was responsible for the

---

[8] The document indicates that visiting scientists submitted the amount of time they would be conducting research on Cayo Santiago to the Secretary/Administrator of Cayo Santiago and that invoices were then submitted to CPRC headquarters. The Scientist in Charge worked with the secretary to determine who was present on the island for additional biannual invoices that were prepared for the scientists' home institutions.

-29-

genetic data. Gerald testified that she was only obliged to perform certain tasks with the data, like organizing it, but not other aspects, like gathering it.

As for Kraiselburd's claim that she was not maintaining a physical presence at work, Gerald testified she was never given any direction as to how many hours she had to work in a week, how many times she had to go to Cayo Santiago, or how many hours she had to be in the office. She testified that she often worked from home and on average she worked long hours and seven days a week, even if she was not physically present in the office.

Gerald also addressed the critiques about how she conducted herself on Cayo Santiago. She offered the deposition of Félix Román Oquendo, a Cayo Santiago employee. Román disputed the notion that Gerald forced boat personnel out in dangerous situations. He testified that it was actually the visiting scientists, and in one instance Kraiselburd, who did this. Román said Gerald simply tried to mediate between the researchers and boat personnel and that she was respectful of the latter's assessment of ocean conditions.

As for the incident where Gerald called Viera an asshole, Gerald testified that she was just joking and that she did not understand the complexities of the Spanish word cabrón. Román also testified about this incident and he had a similar take. Román said Viera told him that it was not a big deal because he and

Gerald were just fooling around.  Román said they were all very close and often joked around or spoke crassly.  At his deposition, Román also theorized that Kraiselburd was trying to manufacture employee complaints in an effort to oust Gerald.  As an example Román cited the name calling incident, which he said had long been forgotten when Kraiselburd came around a few months later (and about a month after Kraiselburd propositioned Gerald) asking about it.  At this time, Viera wrote the letter cited above, though Román theorized that based on how Viera speaks and how the letter reads, it was not actually Viera who put pen to paper.

Also in contrast to the sometimes impertinent language Gerald used in her emails, there was also evidence of good natured back and forth between the pair.  One case in point, in the midst of one of their spats Gerald told Kraiselburd: "You succeed at whatever you want to accomplish.  It is my confidence in you which convinces me of your actions or lack thereof."  When Kraiselburd said he was ill, Gerald responded: "I am so sorry.  Rest, please rest."  And after yet another squabble, she wrote: "I am sorry for the trouble and I understand your position and shall contact you in the future."

"Faced with a motion for summary judgment, it was [Gerald's] burden to establish that there existed evidence creating a trial-worthy claim."  Hernández-Loring, 233 F.3d at 53.  We think she did that.  Gerald presented evidence of questionable comments

-31-

made by Kraiselburd over email directly before and after he propositioned her as well as evidence that countered the notion that she was not performing well in her job.[9]  With this evidence Gerald put forth a trial-worthy claim that Kraiselburd used Gerald's reaction to unwelcome harassment as a basis for decisions that affected the terms of her employment.  The district court erred in granting summary judgment on Gerald's quid pro quo harassment claim.

## B. Retaliation

Title VII makes it unlawful for an employer to discriminate against an employee who has opposed an unlawful employment practice.  42 U.S.C. § 2000e-3(a).  To make out a prima facie case of retaliation under the familiar McDonnell Douglas

---

[9] The evidence as to the timing of things bears noting. Gerald was stripped of the title Scientist in Charge just about two months after she rejected Kraiselburd's advance in the hotel parking lot.  We have considered temporal proximity in the context of retaliation claims, see Calero-Cerezo v. United States Dept. of Justice, 355 F.3d 6, 25 (1st Cir. 2004), and other circuits have extended it to quid pro quo inquiries, see Papelino v. Albany Coll. of Pharmacy and Union Univ., 633 F.3d 81, 90 (2d Cir. 2011); Frensley v. N. Miss. Med. Ctr., Inc., 440 Fed. Appx. 383, 387 (5th Cir. 2011).  There is no need to make the leap here because Gerald has presented enough evidence to withstand summary judgment without this temporal proximity being considered but we thought it worth pointing out.  Further noteworthy on the timing front is that the letters the University produced critiquing Gerald's performance also came after the rejection, even though some related to matters that originated before (i.e., fee billing and the name calling incident).  We are not saying this establishes that Kraiselburd was trying to drum up evidence to support Gerald's removal from her position but all of these timing questions strike us as an issue of material fact better left to the jury.

burden-shifting framework, a plaintiff must show that: (1) she engaged in protected activity under Title VII, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity.  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010); McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  If a plaintiff makes this showing the burden swings to the defendant "to articulate a legitimate, non-retaliatory reason for its employment decision."  Collazo, 617 F.3d at 46.  If a defendant can do this then the burden travels once more to the plaintiff to show that the reason is pretext and that retaliatory animus was the real motivating factor.  Id.

The University contends that Gerald's retaliation argument is waived because she failed to properly develop it on appeal.  It is likely correct.  Gerald's argument was woefully undeveloped and perfunctory.  She provided case law that explained what goes into proving retaliation and then never applied it to the facts of her case.  Gerald gave a bit more substance in her reply brief, but this came too late.  See Tejada-Batista v. Morales, 424 F.3d 97, 103 (1st Cir. 2005).  Nonetheless Gerald's claim is easily disposed of on the merits and so we address it.

Gerald has undoubtedly established the first element of a prima facie case.  It is undisputed that her filing of the

administrative sexual harassment complaint constituted a protected activity. She does not fare so well on element two.

First, Gerald did not articulate what specific, wrongful actions the University took against her after she filed her complaint. Even assuming she was alleging the same instances she did below (i.e., a constitutionally defective administrative procedure, filing of administrative charges, and her transfer to the Laboratory), Gerald has not shown, or even attempted to articulate, why these actions were "materially adverse" such that they would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006). Nor did Gerald rebut the district court's specific findings (other than to generically say it erred) that her constitutional claim was waived because she failed to include it in the complaint, or that the administrative charge was stayed indefinitely, and therefore neither of these things could constitute adverse employment actions. In sum, Gerald has not shown that she suffered a materially adverse employment action.

As for the causation element, Gerald says that the temporal proximity between her sexual harassment complaint and the University's unspecified actions was enough. We have found certain temporal spans sufficient to make out a prima facie case for causation in other retaliation cases. See, e.g., Harrington v.

<u>Aggregate Indus. Ne. Region, Inc.</u>, 668 F.3d 25, 32 (1st Cir. 2012).

It is difficult to say whether timing would be enough here given that, as we said, Gerald has not articulated what actions she is contesting. But even assuming it is sufficient, Gerald, for the above reasons, has failed to satisfy all three elements of a prima facie retaliation case. The inquiry ends here; with no prima facie case made there is no need to shift the burden to the University.[10] The district court's dismissal of the retaliation claim is affirmed.

## C. Constructive Discharge

Constructive discharge typically "refers to harassment so severe and oppressive that staying on the job while seeking redress - the rule save in exceptional cases - is intolerable." <u>Lee-Crespo</u> v. <u>Schering-Plough Del Caribe, Inc.</u>, 354 F.3d 34, 45 (1st Cir. 2003) (internal quotation marks and citation omitted). A successful constructive discharge claim requires "working conditions so intolerable that a reasonable person would have felt

---

[10] Had we found that Gerald met her burden, the University had an argument ready. It claimed to have facially legitimate reasons for the actions it took. For support it offered evidence that, pursuant to University regulations, filing false charges against a co-worker (which is what the investigating officer thought happened here) and negligence in the performance of one's duties (also thought to have happened) was cause for disciplinary sanctions. The University also pointed out that one of the recommendations of the internal investigation was that Gerald not remain at Cayo Santiago. It asserts this was the reason for Gerald's transfer to the Laboratory, a transfer it characterizes as a precautionary measure. However, like we said, there is no need to decide if these reasons are in fact legitimate.

compelled to resign." Pennsylvania State Police v. Suders, 542 U.S. 129, 147 (2004). A plaintiff seeking to withstand summary judgment must point to evidence in the record showing that just such conditions existed. Ahern v. Shinseki, 629 F.3d 49, 59 (1st Cir. 2010). The standard to meet is an objective one, "it cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held." Roman v. Potter, 604 F.3d 34, 42 (1st Cir. 2010) (internal quotation marks and citation omitted).

Gerald does not argue that Kraiselburd's harassment compelled her to resign but instead focuses on what happened after she filed her sexual harassment complaint. She says that her change in title to Staff Scientist and reassignment to the Laboratory was "painful and unendurable." Gerald cites to the reduction of her $800 bonus, the additional gasoline and toll costs, as well as the increased commuting time, caused by her relocation, and the fact that she could not perform her science in her new post. According to Gerald she was also clinically depressed. Keeping these things in mind we ask the objective question: did Gerald establish that her working conditions become so intolerable that a reasonable person in her place would feel forced to resign? See Pennsylvania State Police, 542 U.S. at 141. The short answer is no.

The evidence showed that Gerald was moved to another position in the CPRC. She calls this re-title to Staff Scientist

a demotion but whether this is the case is not readily apparent. There was no evidence of what her new duties were. The only evidence we have (assuming its trial-worthiness) is Gerald's own letter of resignation in which she says that there was no work for her in this new position and that she did not have access to her subjects. Gerald makes a similar, fleeting assertion in her deposition, stating that she had nothing to do in the Laboratory but read; however, she never explained why reading was not job related or job worthy. Further, Gerald did retain her professorship in the elevated position of Associate Professor. As for the inconveniences associated with the transfer, Gerald said in her letter of resignation that her commute increased by a couple of hours and there was associated gasoline and tolls costs. Gerald's pay was also impacted as her $800 monthly bonus was reduced to $200 when she lost the Scientist in Charge title but, at the same time, she gained a $1,000 a month pay raise with her professorship promotion.

Viewing all of this evidence, we do not find Gerald's working conditions, which amounted to a transfer within the CPRC and some slight commuting inconveniences and costs, so intolerable that a reasonable person in Gerald's place would feel forced to resign as opposed to stay on the job while seeking redress. This is not to say that a transfer with associated inconveniences and costs could never constitute a constructive discharge; it just does

not in this case. See Vieques Air Link, Inc. v. United States Dep't of Labor, 437 F.3d 102, 108 (1st Cir. 2006) (finding that there was sufficient evidence to support a constructive discharge finding when an employee was transferred to a different island that he had no way of reaching by boat or plane) (citing Alicea-Rosado v. García-Santiago, 562 F.2d 114, 120 (1st Cir. 1977) ("Doubtless a drastic increase in commuting time and unreimbursed costs might at some point become sufficiently onerous to justify an employee in quitting.")).

Moreover, the timing of Gerald's resignation does nothing to help her case. "If a plaintiff does not resign within a reasonable time period after the alleged harassment, he was not constructively discharged." Landrau-Romero v. Banco Popular De Puerto Rico, 212 F.3d 607, 613 (1st Cir. 2000). Here Gerald voluntarily resigned from the University (and immediately started in a more lucrative position) a little over a year after the final act of harassment and eight months after she was transferred to the Laboratory. Her resignation came too late after the offensive conduct and reassignment to be labeled a constructive discharge. See id. (seven month period between harassing acts and resignation was found to be too long to support a constructive discharge claim); Smith v. Bath Iron Works Corp., 943 F.2d 164, 167 (1st Cir. 1991) (six month period too great for a constructive discharge claim).

After a thorough review of the record, we agree with the district court that Gerald did not present enough evidence to withstand summary judgment. The court's dismissal of her constructive discharge claim is affirmed.

## LAW 17 AND 69 CLAIMS

The final piece we must address is Gerald's state law claims against Kraiselburd. Specifically she alleges that he violated Puerto Rico Law 17, which provides that sexual harassment in employment is "an illegal and undesirable practice," P.R. Laws. Ann. tit. 29, § 155, and Law 69, which prohibits gender based employment discrimination, id. § 1321. Gerald does not advance any new arguments here but simply says that the same facts she alleged to support her Title VII claims against the University were sufficient to defeat summary judgment on the state law claims. Kraiselburd's counter is two-pronged; he alleges that Gerald's claims are time barred and then, in the alternative, attacks the merits advancing essentially the same arguments the University did on the Title VII front. We will start with the timeliness question.

A one year statute of limitations applies to Law 17, id. § 155m; Valentín-Almeyda, 447 F.3d at 101, and Law 69 claims, Rodríguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 60-61 (1st Cir. 2005). See Cabrero Pizarro v. Christian Private Acad., 555 F. Supp. 2d 316, 319 (D.P.R. 2008). Kraiselburd contends - and

-39-

Gerald does not dispute - that the last action he took that could be considered discriminatory or retaliatory was his demoting Gerald to Resident Scientist, which he did in a letter dated June 29, 2007.[11] Gerald filed her complaint in the district court over a year later on September 22, 2008. Gerald says this is not a problem for two reasons: one, Kraiselburd failed to make this statute of limitations argument in his motion for summary judgment and two, her filing of the EEOC complaint tolled the statute of limitations.

We are less concerned that Kraiselburd, who did advance a statute of limitations defense in his answer, has waived this argument by failing to raise it in the summary judgment motion. An appellee is typically free to defend a judgment below on any ground made manifest by the record, McGuire v. Reilly, 260 F.3d 36, 50 (1st Cir. 2001), and we are similarly free to affirm a grant of summary judgment for any reason apparent in the record, Jones v. Secord, 684 F.3d 1, 5 (1st Cir. 2012). The real problem here is it is not clear based on the record whether the statute of limitations should be tolled.

---

[11] Kraiselburd argues that the letter which he penned dated December 4, 2007, which memorialized Gerald's transfer to the Laboratory, should not be considered against him for statute of limitations purposes because it was the University that took this action. Even though he signed the letter, Kraiselburd said he had no power to order Gerald transferred. Gerald does not argue otherwise.

In Puerto Rico the filing of an EEOC complaint alleging sex discrimination in violation of Title VII tolls the statute of limitations on equivalent state law claims, Huertas-Gonzalez v. Univ. of Puerto Rico, 520 F. Supp. 2d 304, 316-17 (D.P.R. 2007), and this court has applied this principle to both Law 17 and 69 claims, Valentín-Almeyda, 447 F.3d at 101 (citing P.R. Laws Ann. tit. 31, § 5303) (tolling a Law 17 claim); Rodríguez-Torres, 399 F.3d at 61 (tolling a Law 69 claim). We have held, at least in the context of a Law 17 claim, and we see no reason why the same would not apply to a Law 69 one, that there is an identicality requirement and the extra judicial claim must be the same as that later sought in court. Valentín-Almeyda, 447 F.3d at 101. The defendant-employer must also be put on notice that a claim is being pursued against him. Id.; Rodríguez-Torres, 399 F.3d at 61; Huertas-Gonzalez, 520 F. Supp. 2d at 317.

In his brief to this court Kraiselburd claims that he was not included as a respondent in the EEOC complaint (only the University was he says) and that he never received notice of the EEOC complaint. Whether either of these things would mean that tolling would not apply is questionable. See Valentín-Almeyda, 447 F.3d at 101-02 (finding that an administrative charge that listed the defendant supervisor as one of the individuals who discriminated against the plaintiff and stated all the necessary elements of a discrimination claim was enough to put the defendant

-41-

on notice and toll a Law 17 claim).  But either way we cannot say for sure.  The EEOC complaint is not part of the record and so we do not have any actual evidence of who was named, what was alleged, or even the exact date the EEOC complaint was filed.  Nor do we have any evidence of whether Kraiselburd was actually on notice of the complaint.  Without this critical information we cannot decide whether the statute of limitations should be tolled and therefore cannot definitively say whether Gerald's state law claims are time barred.  We decline Kraiselburd's offer to affirm summary judgment on timeliness grounds; the record is simply insufficient on this point.  Instead we turn to the merits of the state law claims and these we can make quick work of.

Law 17 and 69 serve virtually the same purposes and outlaw essentially identical behavior, and Law 69's specific prohibition on gender discrimination overlaps with Law 17's bar on sexual harassment.  García v. Sprint PCS Caribe, 841 F. Supp. 2d 538, 564 (D.P.R. 2012).  Furthermore, for our purposes, the substantive law of Puerto Rico on sexual harassment appears to be aligned with Title VII law; the latter's precedents being used freely to construe the former.  Hernández-Loring, 233 F.3d at 52 (finding that Puerto Rico and Title VII law match up for purposes of a hostile work environment and quid pro quo claim).  Therefore we need not say much on this point.  For the same reasons summary judgment should not have been granted on Gerald's Title VII sexual

harassment claim, it should not have been granted on her Law 17 and 69 claims. The district court erred.

## CONCLUSION

For the reasons stated, we affirm the district court's grant of summary judgment on the retaliation and constructive discharge claim. The grant of summary judgment on the Title VII sexual harassment claim (both hostile work environment and quid pro quo) and the Law 17 and 69 state law claims is vacated and those claims are remanded for further proceedings. Costs are awarded to the appellant. So ordered.