# United States Court of Appeals

## For the First Circuit

No. 13-1054

TAHAR AHMED,

Plaintiff, Appellant,

v.

JEH CHARLES JOHNSON,[*] SECRETARY,
UNITED STATES DEPARTMENT OF HOMELAND SECURITY

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Thompson, Selya, and Lipez,
Circuit Judges.

Ozell Hudson Jr. for appellant.
Jennifer A. Serafyn, Assistant U.S. Attorney, with whom Carmen
M. Ortiz, United States Attorney, was on brief, for appellee.

May 21, 2014

---

[*]Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Jeh
Charles Johnson has been substituted for Janet Napolitano as
Secretary of the Department of Homeland Security.

**LIPEZ, Circuit Judge**. Appellant Tahar Ahmed, a Muslim and native of Algeria, brought this employment discrimination action claiming that he was passed over for the position of Deportation Officer in the U.S. Department of Homeland Security on account of his religion, race, and national origin. The district court granted summary judgment for appellee, the Secretary of the Department ("the Department"), finding that Ahmed failed to rebut the Department's legitimate non-discriminatory reason for choosing other applicants and thus did not raise a factual issue of impermissible animus.

Based on a careful review of the record, we conclude that Ahmed presented sufficient evidence for a jury to find that he was a victim of discrimination. We therefore vacate the district court's judgment and remand for further proceedings.

**I.**

**A. Factual Background**

The events underlying this case are largely undisputed. To the extent that the parties disagree about what occurred, we adhere to the plaintiff's version in keeping with our role in reviewing a grant of summary judgment. See Johnson v. Univ. of P.R., 714 F.3d 48, 52 (1st Cir. 2013). We sketch here only the background leading up to the claim of discrimination, reserving for our later discussion a more detailed recounting of the facts pertinent to our decision.

Appellant Ahmed has worked as an Immigration Enforcement Agent for U.S. Immigration and Customs Enforcement ("ICE") since 2003, and has been assigned throughout that period to the Criminal Alien Program ("CAP") in the Boston Field Office. Employees who work in the CAP, one of several units within ICE's Detention and Removal Operations, investigate the alienage and deportability of individuals detected through the criminal justice system. From the perspective of co-workers and supervisors, Ahmed has been an exemplary employee. One superior stated that he "always performed at an outstanding level," and another described him as an "[e]xcellent worker" with "awesome leadership, and great work ethics."

In the summer of 2009, ICE posted a vacancy announcement for the position of Deportation Officer, which stated that applications would be accepted from June 10 through July 28. That timing was qualified, however, by the following notice, which appeared in the announcement in all capital, bold letters:

> This is a two (2) month open announcement which will be used to fill both current and future vacancies within a variety of organizational components, duty locations and grade levels. If needed, the first cut-off for receipt of applications will be June 24, 2009. Additional cut-off dates may be established throughout the open period of the announcement. Only those applications received prior to the cut-off dates will be considered. Applicants are encouraged to apply early in order to maximize their opportunity for consideration.

The announcement stated that the major duties of the Deportation Officer position included legal research, assisting government attorneys in court, and working with both criminal and non-criminal aliens at various stages of their deportation or exclusion proceedings. The specified qualifications included experience in immigration investigations,[1] and applicants would be rated based on their responses to a questionnaire asking thirty-eight questions about their job-related knowledge, skills, and abilities.

On July 13, 2009, the Boston Field Office requested the names of qualified applicants for each of the grade levels covered by the announcement. The ICE Office of Human Capital sent the Field Office lists of certified applicants for the Grade 9 and 11 levels, each of which contained the names of seventeen candidates, along with their application materials. At that point, Ahmed was not yet a candidate for the position, as he did not apply until July 28 -- the final deadline for submitting an application.

On July 27 -- the day before Ahmed applied -- Assistant Field Office Director John Lawler, the recommending official for the Deportation Officer position, forwarded to his superior the names of three individuals from the Grade 11 referral list: Anthony Ciulla, Richard Lenihan, and Daniel Shepherd. All three are white

_____

[1] The position was open to applicants with varying levels of experience, and the salary and job grade of the successful applicant would depend on his or her prior experience and qualifications. Ahmed qualified at both the Grade 9 and Grade 11 levels, and was seeking a Grade 11 position.

-4-

males whose primary recent experience in ICE was in the Travel Unit, and all of whom had been within Lawler's chain of command. In an affidavit, Lawler stated that he "recommended each applicant based upon their resume, work history and educational background," as well as "on what I personally witnessed daily as they performed their duties" in the Burlington and Boston ICE offices.[2] Lawler's superior, Deputy Field Office Director James Martin, agreed with the recommendations and forwarded the three names to the selecting official, Boston Field Office Director Bruce Chadbourne.

On August 26, the Boston Field Office made a second request for qualified applicants for the Deportation Officer position. Ahmed's name appeared on the new Grade 9 and Grade 11 lists of certified applicants, but there is no evidence that any additional names were recommended to Chadbourne based on those lists.[3] Chadbourne announced the promotions of Ciulla, Lenihan, and Shepherd on three separate occasions in September and early

---

[2] The physical location of the Boston Field Office moved from Boston to Burlington in about 2007. The Burlington office serves as both a local office and headquarters for the six New England states: Massachusetts, Maine, New Hampshire, Vermont, Rhode Island, and Connecticut. Each state also has a local ICE office.

[3] The new lists included names that also had appeared on the earlier lists, including Ciulla's, and thus apparently reflected a new ranking of eligible candidates that included more recent applicants. The transmittal sheets for the earlier lists noted a cutoff score of 70 for both the Grade 9 and Grade 11 positions, with seventeen applicants certified as eligible for each. The transmittal sheets for the later lists noted a cutoff score of 93 for the Grade 9 position (with twenty certified applicants) and 92 for the Grade 11 position (with twenty-three certified applicants).

October 2009.[4]  In an affidavit, Chadbourne said the three men were selected as "the best qualified candidates" based on "past performance, experience, training, education and work product."  He particularly praised their willingness "to accept difficult duties and assignments that others would not, such as working in the Travel Unit."  Ahmed was notified on October 1 that he was not selected for a promotion.

The record includes evidence showing a paucity of minority employees serving as Deportation Officers in the Boston Field Office during Chadbourne's tenure as Field Office Director. Chadbourne acknowledged that no African-American had served as a Deportation Officer in the Boston headquarters during the years he ran the office, from 2003 to 2011, although he recommended an African-American woman for a Deportation Officer position in the Hartford, Connecticut office and later promoted her to Assistant Field Office Director there.  Chadbourne estimated that seven or eight Hispanics worked as Deportation Officers or supervisory Deportation Officers during his tenure.  The six New England

---

[4] A fourth Deportation Officer position also was filled at that time, but it is not at issue here.  The fourth selectee, Priscilla Ward-Altamirano, was described as a "humanitarian transfer" because she was seeking to relocate to a position near her husband's job.

offices had a total of about fifty Deportation Officers during that period.[5]

## B. Procedural Background

Ahmed filed the amended complaint underlying this action on August 5, 2011, alleging that he was denied the promotion to Deportation Officer based on his Muslim religion, his race as an Arab,[6] and his national origin as an Algerian, in violation of Title VII of the Civil Rights Act of 1964. See 42 U.S.C. § 2000e-2(a). He claimed, inter alia, that he was "more qualified than the three individuals selected," his outstanding record contrasted with the "very poor work habits" of one of the three successful applicants, and there had never been a black Deportation Officer in the Boston Field Office. The Department moved for summary judgment, arguing that Ahmed had failed to make a prima facie

---

[5] We note some confusion in the record over the actual number of minority Deportation Officers under Chadbourne's supervision during the pertinent period. A workforce profile for July 2009 that was prepared as part of the investigation into Ahmed's complaint reported that, of 35 positions, there were 32 white employees, one Hispanic, one black, and one Asian. Chadbourne questioned both the total number of positions and the number of Hispanics, stating that he knew of five Hispanic Deportation Officers "off the top of [his] head," including one supervisor. He indicated that a total of about seven to ten of the approximately fifty people who were employed as Deportation Officers during his tenure were minorities.

[6] Ahmed testified in his deposition that he listed his race as "white, North African" in his application for the Deportation Officer position. A supervisor, Keith Foster, testified that, in his opinion, Ahmed is black. Chadbourne testified that he understood Ahmed to be African-American.

showing of discrimination because he was not an applicant at the time Lawler made his recommendations and, even if he had established a prima facie case, there was no evidence that the selections were based on discriminatory criteria.

Evaluating the evidence pursuant to the familiar burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), see infra, the district court concluded that Ahmed had failed to make his case with respect to Lawler and Martin because they made their recommendations before he submitted his application. As to Chadbourne, the district court held that Ahmed failed to rebut the Department's assertion that the three selectees were chosen because of their qualifications. Concluding that no jury considering the evidence could find the defendant's explanation to be a pretext for discrimination, the court held that "a trial on these issues is not warranted" and, hence, granted defendant's motion for summary judgment.

This appeal followed.

## II.

### A. Standard of Review

Our review of a district court's grant of summary judgment is de novo. Johnson, 714 F.3d at 52. In conducting our "fresh look" at the record, we view the evidence in the light most favorable to the non-moving party, Ahmed, and draw all reasonable inferences in his favor. Gerald v. Univ. of P.R., 707 F.3d 7, 16

(1st Cir. 2013). Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Gerald, 707 F.3d at 16. To determine whether a trial-worthy issue exists, we look to all of the record materials on file, including the pleadings, depositions, and affidavits. Fed. R. Civ. P. 56(c)(1)(A); Johnson, 714 F.3d at 52. We may neither evaluate the credibility of witnesses nor weigh the evidence. See Sheehan v. N. Am. Mktg. Corp., 610 F.3d 144, 149 (1st Cir. 2010). Summary judgment is inappropriate if the evidence "is sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side." Gerald, 707 F.3d at 16 (internal quotation marks omitted).

**B. Legal Principles**

Where, as here, a claim of discrimination under Title VII rests on circumstantial evidence, we apply the McDonnell Douglas burden-shifting analysis to help the parties "sharpen the inquiry into the elusive factual question" of the employer's motivation. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 n.8 (1981); see also Johnson, 714 F.3d at 53-54. Under that framework, the plaintiff must first establish a prima facie case of discrimination. Johnson, 714 F.3d at 53. If he succeeds, an inference of discrimination arises, and the burden of production shifts to the defendant to produce evidence that the challenged

employment action was taken for a legitimate, non-discriminatory reason. Id. at 53-54. If the employer supplies such evidence, the plaintiff is left with the burden to prove "by a preponderance of the evidence that the employer's proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory." Id. at 54.

To establish a prima facie case of discrimination, Ahmed needed to show that (1) he is a member of a protected class, (2) he was qualified for the open position of Deportation Officer, (3) he was denied the position, and (4) the position was given to someone with similar or inferior qualifications. See Goncalves v. Plymouth Cnty. Sheriff's Dep't, 659 F.3d 101, 105 (1st Cir. 2011); Ahern v. Shinseki, 629 F.3d 49, 54 (1st Cir. 2010). Although the district court acknowledged that Ahmed had established each of these criteria, it concluded that he nonetheless had failed to state a prima facie case against "the recommending officers," Lawler and Martin, because they submitted their recommendations to Chadbourne before Ahmed applied for the job. The court thus focused the remainder of its analysis solely on the final selections made by Chadbourne.

We disagree with the court's approach. Particularly when the record is viewed in the light most favorable to Ahmed, the key fact about timing is that the promotions were announced after he applied for the job. The record does not reveal what precipitated

the request for a new list of qualified applicants after Lawler and Martin had forwarded their recommendations to Chadbourne on July 27, but the evidence permits the inference that Lawler and Martin were provided the new lists of certified individuals in time to consider Ahmed's application. For example, both say in their affidavits that they chose the qualifications of the three selected individuals over Ahmed's; neither says that he did not have the opportunity to consider Ahmed's application.[7]

Moreover, contrary to the Department's assertion at oral argument, the record contains evidence that would permit a jury to find that Chadbourne also knew that Ahmed had applied before the appointments were announced. Most significantly, Chadbourne stated in his affidavit that he had reviewed the referral lists himself, and he reported in his deposition that he "must have seen [Ahmed's] application as his name appeared on the list." Chadbourne also

_____

[7] In response to the question "What specifically caused you to recommend the successful candidate(s) over the Complainant," Lawler stated, in part: "I recommended these individuals over Mr. Tahar and other candidates based upon my knowledge of what the position would require of them." In response to the question "Why did you specifically not recommend the Complainant," he stated, in part: "Candidate/applicant Tahar did not have the experience of the candidates/applicants Ciulla, Lenihan and Shepherd with regard to case management oversight." Martin's affidavit similarly explained that he did not recommend Ahmed because "[t]hose recommended had the additional experience of working in the Travel Section that the Complainant did not have." Further, when Lawler was asked at his deposition if he had considered performance ratings "for the successful selectees in relationship to [Ahmed]," Lawler responded that he did not take such ratings into account because he wasn't aware there were any -- again suggesting that he did at some point consider both the selected individuals and Ahmed.

-11-

testified in his deposition that it was "standard practice" for the lists of certified applicants to be forwarded from the ICE Office of Human Capital to his office. Lawler testified that Martin gave him the first packet of application materials. Viewing this evidence in the light most favorable to Ahmed, it is fair to infer that each set of applications was sent from the Office of Human Capital to Chadbourne's office and that Chadbourne (or someone in his office) passed the materials on to Martin, who then gave them to his subordinate, Lawler, whose job it was to make the promotion recommendations that went back up the line to Chadbourne. Given this evidence, a jury could conclude that all three men knew at the end of August -- before the promotions were announced -- that Ahmed had applied.

In addition, the record does not reveal when Chadbourne made the promotion decisions. So far as we know, the decisions could have been made on the days they were announced in September and October, well after Ahmed submitted his application. Hence, we must presume at this point that Lawler and Martin had the opportunity to revise their recommendations, based on the second list of certified Grade 11 applicants, before Chadbourne made his selections.

Accordingly, we treat the failure to promote Ahmed as a single decision made by the three hiring officials. Although Lawler made the initial selections, Martin's and Chadbourne's

-12-

affidavits reasonably may be read to say that they also weighed the candidates' qualifications before endorsing the recommendations.[8] Given these facts, it is unnecessary to distinguish here between the recommending employees and the ultimate decisionmaker. Cf. Staub v. Proctor Hosp., 131 S. Ct. 1186, 1189 (2011) (considering "the circumstances under which an employer may be held liable for employment discrimination based on the discriminatory animus of an employee who influenced, but did not make, the ultimate employment decision").

Ahmed thus met his "modest burden" to establish a prima facie case against each of the hiring officials. Lockridge v. Univ. of Me. Sys., 597 F.3d 464, 470 (1st Cir. 2010). The Department, in turn, has met its burden to identify a legitimate, non-discriminatory reason for rejecting Ahmed's promotion: the employer's conclusion that the chosen candidates had superior qualifications.[9] For purposes of the summary judgment analysis,

---

[8] In addition to the comments described above, Chadbourne specifically noted that he had "prior knowledge" of Ciulla, Lenihan, and Shepherd because they worked in the Boston Field Office.

[9] Although the Department also argued before us that Ahmed was not selected because he applied too late to be considered -- i.e., after Lawler and Martin made their recommendations -- we have explained why the lateness rationale does not hold up factually. Ahmed asserts that the inadequacy of that reason allows an inference of pretext. We agree that this unsupported explanation lends additional weight to our conclusion that summary judgment was improperly granted here. It does not, however, negate the Department's reliance on the supposedly superior qualifications of the chosen applicants. Our analysis therefore focuses on that

-13-

then, the question becomes whether a reasonable jury could find that the Department's proffered reason is pretextual and that Ahmed was in fact denied the promotion because of his religion, race, or national origin.  Id.  Stated otherwise, we must determine if "there is 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination.'"  Holland v. Gee, 677 F.3d 1047, 1056 (11th Cir. 2012) (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1326 (11th Cir. 2011)).

In some cases, a plaintiff alleging unlawful employment discrimination can defeat summary judgment simply by rebutting the employer's given reason for choosing another candidate because, once the employer's proffered justification is unmasked as pretext, the evidence that comprised the prima facie case, with the evidence of pretext, suffices to support a finding of discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 148 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.");  Vélez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 452 (1st Cir. 2009) (holding that employer's explanation for firing employee "so lacks rationality that it

_____

second rationale.  Relatedly, we note that we see no basis in the record for Ahmed's assertion that Lawler and Martin deliberately submitted their recommendations early because they knew that he would be applying later.

-14-

supports the inference that the real reason . . . was his age"); Domínguez-Cruz v. Suttle Caribe, Inc., 202 F.3d 424, 430 n.5 (1st Cir. 2000) (explaining that "introduction of additional evidence is not necessarily required" when plaintiff makes prima facie showing and adduces evidence of pretext); Thomas v. Eastman Kodak Co., 183 F.3d 38, 64 (1st Cir. 1999) ("Where the disparity in treatment is striking enough, a jury may infer that race was the cause, especially if no explanation is offered other than the reason rejected as pretextual.").

In other instances, a jury's determination that the employer's explanation is pretextual will not inevitably reveal discrimination. This is so because the employer may resort to a pretext to conceal an arguably inappropriate, albeit not unlawful, motivation, such as to curry favor with a friend or family member. See, e.g., Barry v. Moran, 661 F.3d 696, 708 (1st Cir. 2011) (noting that "an employment decision motivated by cronyism, not discrimination, would be lawful, though perhaps unsavory" (internal quotation marks omitted)); Keyes v. Sec'y of the Navy, 853 F.2d 1016, 1027 (1st Cir. 1988) (stating the need for evidence indicating that discrimination and not other factors, such as "garden-variety cronyism," influenced the decisionmaking process). Even where a court looks to additional evidence, however, the plaintiff's burden is not onerous: "All a plaintiff has to do is raise a genuine issue of fact as to whether discrimination

motivated the adverse employment action." Domínguez-Cruz, 202 F.3d at 433 (internal quotation mark omitted); see also Pearson v. Mass. Bay Transp. Auth., 723 F.3d 36, 40-41 (1st Cir. 2013) ("To defeat summary judgment, [the plaintiff] must offer some minimally sufficient evidence, direct or indirect, both of pretext and of [the employer's] discriminatory animus." (internal quotation marks omitted)).  The question is whether the record contains "specific and competent evidence" from which a reasonable jury could find discrimination.  Gerald, 707 F.3d at 16.

With these principles in mind, we consider below whether a jury could conclude on this record that Ahmed was passed over for promotion based on his religion, race, or national origin.

## C. Discussion

### 1. Pretext

The Department contends that the decision to promote Ciulla, Lenihan, and Shepherd was unrelated to Ahmed's race, religion, or national origin, and instead reflected the hiring authorities' genuine determination that those three men were the best applicants for the Deportation Officer positions.  Without question, the record contains sufficient evidence for a jury to accept the Department's explanation.  Lawler, for example, cited his experience as a manager overseeing Deportation Officers for more than twelve years and his own eight years as a Deportation

Officer when asserting that he could identify good applicants for the job. He explained:

> The primary responsibility of a Deportation Officer is the ability to oversee large case management. Applicants Ciulla, Lenihan and Shepherd had all previously been assigned to the Travel Unit, which required them to work directly with the Deportation Officers in overseeing the final steps of effecting the removal of aliens. Their involvement would include knowledge of the progress of the individual cases, knowledge of the Immigration and Nationality Act, and interaction with the Office of Chief [Counsel] staff on the legality of a final removal order. Being assigned to the Travel Unit required constant interaction with Deportation Officers and Supervisory Deportation Officers in the oversight of cases in Removal proceedings. This responsibility certainly influenced my decision.

Lawler went on to say that he deemed the three selected applicants better for the position because they "were more capable of performing case management, which is the primary responsibility of a Deportation Officer." In his deposition, Lawler stated that "the most important tool" in his decisionmaking process was his day-to-day involvement with the successful applicants. He observed that he dealt with the three men "on a regular basis," and thus "had a real good idea of their work and their ability to perform duties." Martin agreed with Lawler's recommendation based on, inter alia, the men's experiences in the Travel Unit "along with their reputation as proven performers." Chadbourne echoed his subordinates' sentiments.

Ahmed, however, disputes the Department's depiction of the successful applicants' qualifications and performance. He points in particular to his extended assignment to the Criminal Alien Program, which he maintains is better training for a Deportation Officer than experience in the Travel Unit. Claiming that no Travel Unit employee had previously been promoted to Deportation Officer, Ahmed describes the work there as perfunctory and, hence, not meaningful preparation for becoming a Deportation Officer. He further claims to have trained Lenihan when the latter joined the CAP shortly before his promotion to Deportation Officer. In addition, Ahmed notes that he achieved a higher score on the qualification test than any of the three men promoted (97, compared to their scores of 96, 92, and 90), and he contrasts his excellent performance history with the characterization of Shepherd by one of Shepherd's supervisors as lazy and underperforming.

The Department maintains that Ahmed's claim of superior qualifications is merely a subjective belief unsupported by the record. See Rathbun v. Autozone, Inc., 361 F.3d 62, 74 (1st Cir. 2004) (noting that "subjective evidence of competing qualifications seldom provides a principled way for a factfinder to determine whether a given employment decision, even if wrong-headed, was anything more than a garden-variety mistake in corporate judgment" (internal quotation marks omitted)). To the contrary, a reasonable jury could find, on this record, that ample evidence corroborates

Ahmed's assertion that his ICE experience was more relevant to the Deportation Officer position than that of the selected candidates and that he had proven himself to be a significantly more valuable employee than Shepherd.  With respect to his performance, as noted above, the record contains sparkling appraisals of Ahmed's work and attitude, contrasting with negative reports of Shepherd's work ethic.  Melinda Lull, a supervisory Deportation Officer, stated in an affidavit that Ahmed "always performed at an outstanding level while under my supervision," and noted in a 2008 award nomination that "[h]e has an excellent knowledge of the laws and policy and it[s] application to his daily work product."  In a 2007 performance review, Lull stated that "Ahmed is one of the top producers within the Criminal Alien [Program]."  A co-worker, Kevin Williams, praised him for doing his job "beyond what was expected," and reported that Ahmed had established contacts within "many other law enforcement departments that ha[ve] enabled him to be more effective in his job."

Meanwhile, Keith Foster, an African-American who worked as a supervisory Immigration Enforcement Agent in the Criminal Alien Program -- and supervised Ahmed for about five months -- described Shepherd as having "one of the worst reputations as far as just being a lazy worker."  Foster noted that he and Shepherd were friends, but Foster nonetheless considered the unflattering assessment to be true and had even discussed it with Shepherd

himself.  Foster also reported that Shepherd was passed over for a transfer to the CAP because of his work habits and the view that "other people . . . had more value," and he recalled that Shepherd "was pulled from being a jail liaison because he was unreliable and . . . complaining and not doing his duties."[10]

To be sure, Foster would not be the perfect witness to establish Shepherd's deficiencies.  Although he worked with Shepherd, Foster never directly supervised him and, like Ahmed, Foster applied for the 2009 Deportation Officer position and filed a discrimination claim when he was not selected.  Moreover, Foster acknowledged that his experience with Shepherd predated Shepherd's work in the Travel Unit.  Nonetheless, Foster's role as a supervisor and his more than fifteen years working at ICE and its predecessor agency (the Immigration and Naturalization Service, "INS") would allow a jury to credit his assessments.  His testimony thus creates a factual dispute concerning the relative qualities of Ahmed and Shepherd as employees.

Ahmed's evidence also countered the selecting officials' assertion that work in the Travel Unit -- the touted experience of all three selected applicants -- was objectively preferable to work in the CAP.  Foster described the CAP as "a much more

_____

[10] We obviously make no judgment about the accuracy of these characterizations of Shepherd.  We merely note this negative assessment because it is evidence that must be viewed in Ahmed's favor on summary judgment.

demanding job" than the Travel Unit, observing that "[a]nyone who knows the Travel Unit knows it's not difficult duties at all." Foster noted that most of the people who previously had been promoted to Deportation Officer came from the Criminal Alien Program. Though conceding possible bias because he had worked in the CAP and not in the Travel Unit, Foster described the CAP as particularly good training for being a Deportation Officer:

> [I]f you work in a CAP Unit, that's the best experience you can get to understand the whole operation of how every job in there works. . . . [Y]ou initiate cases. You interview. You determine their immigration status. You have to apply the law. You have to obtain their criminal records. You have to communicate with courts and . . . other law enforcement agencies. You create the case. The case, before it even goes to the . . . Deportation Officer, is . . . created by the CAP Agent.

In addition, Ahmed undisputedly was a better candidate in one respect. Chadbourne stated that fluency in another language was one of the considerations for the Deportation Officer position. Ahmed has advanced language skills, while the three selectees do not.[11] Also, it is noteworthy that neither Lenihan nor Shepherd appeared on the second list of certified candidates, perhaps indicating that they had dropped out of the top group after

_____

[11] Ahmed's resume described his Arabic skills as advanced. Ciulla described his Spanish proficiency as "[a]cceptable" and his Italian as "[c]ompetent." Lenihan and Shepherd both reported "[n]ovice" Spanish skills.

-21-

additional applications were submitted.[12]  This evidence, taken together, goes far beyond a self-interested assertion by Ahmed that he was "more qualified than the successful . . . aspirants."  Id.

Ahmed's contention that the decisionmakers' reliance on qualifications is pretextual is further supported by the selection process itself.  None of the three hiring officials sought information about the applicants beyond the documents provided by the ICE Office of Human Capital.  They did not interview any of the aspirants and did not review any personnel records.  Lawler acknowledged that he made no attempt to consult with the supervisors or co-workers of individuals on the list before making his recommendations.  Although Ciulla, Lenihan, and Shepherd were all under Lawler in the chain of command, he was not their immediate superior and presumably could have learned more about their capabilities and performance from  direct supervisors.

We do not mean to suggest that it was improper for the hiring officials to make the promotion decisions without including

---

[12]  Based on his rating on the assessment questionnaire, Shepherd was ranked thirteenth out of seventeen applicants on the first list of certified candidates sent by the Office of Human Capital for the Grade 9 position and fourteenth out of seventeen for the Grade 11 position.  Lenihan was ranked ninth on the Grade 9 list and tenth on the Grade 11 list.  Ciulla was ranked second and third.  On the later lists, Ahmed was ranked third for the Grade 9 position out of twenty listed applicants and fifth for the Grade 11 position.  Ciulla was ranked eighth and ninth.  Although the cutoff score for the second Grade 11 list was reported as 92, and the evidence is that Lenihan had a score of 92, [Dkt. 38-2] he was not included on that list.

these steps in the evaluation process. We have repeatedly recognized that it is not our place to second-guess an employer's legitimate business decisions, see, e.g., Goncalves, 659 F.3d at 107; Rathbun, 361 F.3d at 74, and we would overstep our bounds if we imposed our view of an appropriate selection process on these decisionmakers. Indeed, Chadbourne offered a plausible explanation for the curtailed process when he testified that the agency "[m]any times" did not do interviews if there were a number of in-house applicants. He elaborated: "There wasn't a need to, because we knew the people. We knew their work product." In addition, Lawler noted that he may have spoken about the applicants to their supervisors in the past since "[w]e all worked in the same office," and he also said he "constantly would communicate with [his] supervisors about their staff." Moreover, it is undisputed that Chadbourne was authorized to hire any of the applicants certified by the Office of Human Capital.

The extent of the decisionmakers' efforts to gather information about the candidates is relevant here, however, on the issue of pretext. Ahmed contends that the three officials did not genuinely believe that Ciulla, Lenihan, and Shepherd were the best qualified applicants, and that those officials selected three less capable applicants over him because of his race, religion, or

national origin.[13]  Evidence that the hiring officials did not seek out all pertinent information about the candidates' abilities and job performance would support that theory; the jurors could infer from a limited inquiry that the officials falsely claimed to have sought the best candidates for promotion.

The record thus permits two substantially different portrayals of Ahmed's candidacy as compared to those of Ciulla, Lenihan, and Shepherd.  In one view, Ahmed's language skills and long-term tenure in the Criminal Alien Program provided him with the most pertinent resume for the Deportation Officer position, and his exemplary record stands in stark contrast to Shepherd's reputation as an under-performer.  In addition, the selection process reflected a perfunctory or non-existent inquiry from readily available sources into the applicants' relative qualifications.  In the other view, Ciulla, Lenihan and Shepherd were the candidates better suited for the position because of their ability and willingness to perform the demanding work of the Travel Unit, and Lawler was well positioned to make this assessment because he had first-hand knowledge of their work.

Determining which view more accurately reflects reality requires factfinding and credibility judgments that are properly

---

[13] Of course, for Ahmed to prevail, a jury would need to find only that the decisionmakers chose one applicant who was less qualified than him based on discriminatory animus.  This would be enough even if the other two selected for promotion were equally or more qualified than Ahmed.

the task of a jury.  Ahmed's claim of pretext would be
significantly advanced if the jury found that the Criminal Alien
Program has traditionally been recognized as the best training
ground for Deportation Officers, and that the Travel Unit is widely
acknowledged as less demanding.  Such findings would undermine the
Department's insistence that the selected candidates had more
opportunity to develop the skills needed by Deportation Officers.
Similarly, a jury could choose to credit the negative evidence
concerning Shepherd's work habits and thus discredit the hiring
officials' professed reliance on the quality of the successful
candidates' performance.

As explained above, however, the jury would need to
conclude not only that the Department's rationale is pretextual,
but also that its asserted qualifications-based preference for the
selected applicants conceals an impermissible discriminatory
motivation.  We therefore now consider whether Ahmed has adduced
"minimally sufficient evidence" to permit a reasonable factfinder
to conclude that he was not promoted on account of his religion,
race, or national origin. See Pearson, 723 F.3d at 41 (internal
quotation marks omitted).

## 2. Discriminatory Animus

As an initial matter, we reject any suggestion that a
finding of discriminatory animus requires evidence that the
decisionmakers knew specifically that Ahmed is a Muslim and native

-25-

of Algeria. The record contains more than adequate evidence from which a reasonable jury could determine that the decisionmakers viewed Ahmed as a member of multiple minority groups. As noted above, Chadbourne testified that he believed Ahmed was African-American, an impression evidently based on visual observation and, hence, likely to be shared by Lawler and Martin. A jury also could find that all three men knew, or believed, that Ahmed was of Arab heritage. His name is suggestive,[14] and his resume states that he has advanced skills in reading, writing, and speaking Arabic. Chadbourne stated that he had heard that Ahmed was Lebanese. Further, Foster testified that he had heard Ahmed's former supervisor and "[a] lot of people" address Ahmed as "Habibi" -- an Arabic greeting that is commonly understood to mean "friend" or "darling" -- and he also reported speaking with other employees about Ahmed being a Muslim. A jury reasonably could conclude that Lawler, Martin, and Chadbourne were exposed to such exchanges, particularly given Ahmed's testimony that he "interact[ed] with upper management on a daily basis, and I know them all personally."

The question remains whether Ahmed has also adduced the requisite evidence to permit a jury to find that his race, religion, or heritage played a motivating role in the decision to bypass him for promotion. Although the record contains no evidence

---

[14] Indeed, Chadbourne acknowledged that the name would cause him to suspect that Ahmed is of Arab ancestry.

of overt discriminatory conduct or remarks, the McDonnell-Douglas framework is premised on the reality that "[o]utright admissions of impermissible [discriminatory] motivation are infrequent." Hunt v. Cromartie, 526 U.S. 541, 553 (1999); see also, e.g., Vélez, 585 F.3d at 446 (noting that employment discrimination plaintiffs "rarely possess 'smoking gun' evidence to prove their employers' discriminatory motivations"). Moreover, "unlawful discrimination can stem from stereotypes and other types of cognitive biases, as well as from conscious animus." Thomas, 183 F.3d at 59; see also Bray v. Marriott Hotels, 110 F.3d 986, 993 (3d Cir. 1997) (noting that Title VII should "not be applied in a manner that ignores the sad reality that [discriminatory] animus can all too easily warp an individual's perspective to the point that he or she never considers the member of a protected class the 'best' candidate regardless of that person's credentials"). Hence, a plaintiff's showing of unlawful animus will not necessarily be deemed inadequate for lack of explicitly discriminatory behaviors.

As explained above, sufficient evidence to support a finding of pretext, in combination with the plaintiff's prima facie showing, can suffice at times to raise an inference of discrimination that will defeat summary judgment. See Domínguez-Cruz, 202 F.3d at 430 n.5. Here, however, we have more than that combination. An employer's "general policy and practice with respect to minority employment" can be significant in assessing

discriminatory animus, and Ahmed has offered telling evidence of a pattern of bypassing minorities for promotion in ICE's Boston office.  McDonnell Douglas Corp., 411 U.S. at 804-05; see also Mesnick, 950 F.2d at 824,

Most significantly, the record reveals a history of hiring and promotions that entirely excluded African-Americans and, perhaps, Muslims from Deportation Officer positions in Boston. Chadbourne conceded the absence of black Deportation Officers in that office throughout his tenure as Field Office Director,[15] though he emphasized his selection of the one African-American who held that position in any of the New England ICE offices (in Hartford). Chadbourne also reported that, to his knowledge, there were no Arab or Muslim Deportation Officers in Boston during that time.

In addition, Ahmed produced evidence depicting an atmosphere in the Boston office that was unwelcoming to minorities and hindered their advancement.  In his affidavit, Ahmed asserted that "it is widely known locally, as well as nationally, that [the Boston office] is not diversely populated," and similar observations were made by an Hispanic Immigration Enforcement Agent in the Boston office, Efrain Perez:

> Since I've been here the office has never
> shown a racial balance with respect to

---

[15] Chadbourne was assistant director for the INS in Boston for sixteen years before being appointed acting Field Office Director for ICE in 2003.  He formally assumed the director's position in 2004 and remained in that role until his retirement in 2011.

promotions. There are no minority promotions in the office and the number of minority employees are real, real low here. Most all supervisors are White.

. . . They don't recruit or encourage minorities to put in for jobs. I know not to put in an application for a job because I already know that I'm not going to get it. There is no encouragement for minorities to put in for jobs. Management grooms those people they want to promote and they are always Caucasians.

At the time of his affidavit in 2010,[16] Perez had been working in the immigration agency for eighteen years.

Given the historical evidence showing a complete absence of black and Arab Deportation Officers in the Boston office throughout Chadbourne's tenure,[17] and an environment in which Hispanics, according to Perez, also felt discouraged about applying for promotion, this is not a case in which "allowing the failure-to-promote claim[] to go forward would be an invitation to the jury to engage in unbridled speculation." Rathbun, 361 F.3d at 77.

---

[16] Perez's affidavit was prepared in connection with Foster's complaint.

[17] Martin and Lawler also were long-term employees in the Boston office. Lawler stated in his 2010 affidavit that he had been "a manager overseeing Deportation Officers in [the Boston] Field Office for more than twelve years." He also testified that he had served as interim Deputy Field Office Director for about fifteen months, in 2003 and 2004, and became Assistant Field Office Director in late 2005 or early 2006. Martin's employment with the immigration agency began in 1991. So far as we can tell, the record does not indicate how long he had been serving as Deputy Field Office Director at the time of the hiring process at issue here. He was based in the Boston office at least since 2005.

Rather, this backdrop,[18] in combination with a finding of pretext in the Department's articulated rationale for choosing three white male applicants, would permit a reasonable jury to find that Ahmed was a victim of discrimination based on one or more of his minority characteristics.

## III.

In sum, we conclude that Ahmed's proffered evidence raises material disputes of fact that foreclose summary judgment. At trial, the jury will have the opportunity to assess the qualifications evidence, including the comparative value of experience in the Criminal Alien Program and Travel Unit, and the credibility of the three decisionmakers in determining whether Ahmed has proven a violation of Title VII. See Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000) ("[C]ourts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent.").

Accordingly, the judgment of the district court is vacated, and the case is remanded for further proceedings consistent with this opinion.

---

[18] Although the historical evidence has not yet been shown to be statistically significant, see Freeman v. Package Machinery Co., 865 F.2d 1331, 1334 (1st Cir. 1988) (noting expert's testimony that statistical data revealed a pattern "totally consistent with a practice of age discrimination"), it is circumstantial evidence that may inform the jury's evaluation of the decisionmakers' actions.

So ordered.  <u>Costs to appellant.</u>