# United States Court of Appeals
## For the First Circuit

No. 18-1229

BRENDA K. TAITE,

Plaintiff, Appellant,

v.

BRIDGEWATER STATE UNIVERSITY, BOARD OF TRUSTEES; BRIDGEWATER

STATE UNIVERSITY OFFICE OF EQUAL OPPORTUNITY,

Defendants, Appellees,

ERIN DEBOBES, official and individual capacity,

Defendant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Thompson, and Barron, Circuit Judges.

Yotam Barkai, with whom Christopher D. Belelieu and Boies Schiller Flexner LLP were on brief, for appellant.
Joseph P. Lucia, Assistant Attorney General, with whom Maura Healey, Attorney General of Massachusetts, was on brief, for appellees.

June 2, 2021

**THOMPSON, Circuit Judge.**  This is a case about what makes people tick.  Brenda K. Taite, who is Black, brought action against Bridgewater State University's Board of Trustees and Office of Equal Opportunity (collectively, "BSU" or "University") and a University administrator, alleging she was not hired for a position at the University because of her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.[1]  BSU shot back saying they hired the best candidate for the job.  The United States District Court for the District of Massachusetts granted the University's motion for summary judgment and Taite appealed.  Because we find genuine issues of material fact precluded summary judgment, we vacate and remand.

## I.   BACKGROUND[2]

### A.   How It All Started

BSU is a public university owned and operated by the Commonwealth of Massachusetts.  In early 2015, BSU created the position of Staff Associate, Equal Opportunity/Title IX

---

[1] Taite had brought claims for age discrimination, race discrimination, violations of equal protection under the Fourteenth Amendment and the Massachusetts Civil Rights Act, and violations of 42 U.S.C. §§ 1981 and 1983.  After various procedural twists and turns below not pertinent here, only Taite's Title VII claim remains.  She has not appealed any of those other procedural rulings.

[2] Because Taite's case is before us on her appeal from a grant of summary judgment for BSU, we recite the facts in the light most favorable to her.  See Bhatti v. Trustees of Bos. Univ., 659 F.3d 64, 67 (1st Cir. 2011).

- 3 -

Investigator (the "Position"), which reported directly to defendant Erin DeBobes, BSU's Director of Equal Opportunity, Title IX Coordinator, and Title II Section 504 Coordinator.[3] BSU posted the Position in late February 2015. As advertised -- and pertinent to this appeal -- the required minimum qualifications for the Position were:

- Master's degree, OR Bachelor's degree in relevant discipline . . . . Degrees in psychology, counseling, social work or criminal justice are viewed favorably.
- A minimum of 3 years [of] demonstrated experience in complaint, incident, and/or grievance investigation and resolution.
- Experience and training regarding conducting sensitive and confidential investigations alleging discrimination and harassment.
- Knowledge of and ability to interpret federal and state laws regarding discrimination, harassment and equal opportunity.

The preferred qualifications advertised, in relevant part, were:

- Juris Doctorate or Advanced Degree preferred[.]

---

[3] Title IX of the Education Amendments of 1972 is a federal statute prohibiting discrimination on the basis of sex in "any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Similarly, Section 504 of the Rehabilitation Act of 1973 prohibits disability discrimination "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the Americans with Disabilities Act ("ADA") of 1990 applies Section 504 to state and local governments, regardless of whether the state or local program or activity receives federal funds. See 42 U.S.C. § 12131 et seq.

- Over 3 years' experience in complaint and/or grievance investigation and resolution.
- Experience in a higher education setting preferred, public higher education highly preferred.
- Experience with affirmative action.
- Experience conducting mediations.
- Experience handling reasonable accommodation requests.
- Experience with Title IX, Title VI, the ADA [Americans with Disabilities Act], the Rehabilitation Act . . . .
- Background in human resources, student affairs, or diversity programming viewed favorably.

A three-person search committee (the "Search Committee"), which included DeBobes, received eighty-five applications and selected the top sixteen applicants for an initial phone interview, then invited the top five applicants to interview on campus. The Search Committee solicited five BSU administrators (the "evaluators") to observe and evaluate the finalists. The interview consisted of: (1) a 15-minute presentation "on race and national origin/discrimination and discriminatory harassment"; (2) a 20-minute "mock investigation" involving a potential Title IX complaint fact pattern in which a female "student" (played by a BSU staff member) complained her male "professor" (played by another BSU staff member) used harassing names in class and made her feel uncomfortable; and (3) an interview with the Search Committee members.

Among the criteria the finalists would be evaluated on during the mock investigation were familiarity with Title IX procedures ("such as indicating that retaliation is prohibited, discussing available interim measures[,] and addressing confidentiality concerns") and treating the "student" and "professor" with "neutrality, sensitivity, and fairness." The Search Committee would "weigh heavily" each finalist's performance during the presentation and mock investigation.

Each candidate's interview performance was to be assessed with the same evaluation form. The form first asked the evaluators to score each candidate in the following categories: "Preparation and Organization," "Presentation and Delivery," "Quality of Audiovisual Materials (if applicable)," and "Ability to Answer Questions." The scores ranged from 1 (poor) to 5 (exceptional). Then, the forms asked the evaluators to list positive feedback about each candidate's presentation and to discuss the candidate's overall performance.

On or about March 30, 2015, Taite applied for the Position at BSU by submitting an application, cover letter, and résumé. Taite self-identified as Black in her affirmative action application materials. According to her résumé, she had an Associate Degree in Arts, Secondary Education, and History, a Bachelor of Arts Degree in History, a Master of Science Degree in Health Care Administration, and a Juris Doctor Degree, as well as

- 6 -

work experience investigating complaints related to Title IX and equal employment opportunity. She had approximately 5 $\frac{1}{2}$ years of collective, full-time experience investigating student and employee grievances first as Associate Director for Equal Opportunity/Affirmative Action Programs and ADA Coordinator at Dartmouth College and then as Equal Employment Compliance Officer at a private company, Global Investigation & Security, Inc. Taite's résumé highlights some of her responsibilities at Dartmouth College: reviewing recruitment and hiring of administrative employees for compliance with equal opportunity and affirmative action procedures; identifying recruitment initiatives to increase the diversity of applicant pools; investigating and mediating discrimination and harassment complaints; investigating, analyzing, and coordinating responses to employee grievances and allegations of discrimination; writing findings and outcomes of investigations for allegations by students and employees of sexual harassment, sexual discrimination, race discrimination, and age discrimination; familiarity with equal employment opportunity, ADA/Rehabilitation Act Section 504, Title VII, and Title IX; and responding to requests for ADA accommodations from current and prospective employees. Her responsibilities at Global included: investigating, analyzing, and coordinating responses to employee grievances; responding to requests for ADA accommodations from current and prospective employees; mediating employee disputes;

and working with human resources and other departments to develop an effective compliance training program. Overall, Taite's collective experience corresponded with some of the Position's secondary responsibilities[4] as well as nearly all of the preferred qualifications advertised for the Position.[5]

The Search Committee selected Taite for an initial phone interview on or about April 7, 2015, and a few days later, invited her, among five finalists, to a May 7, 2015, on-campus interview. Four of the finalists, including Taite, were Black.[6] The fifth finalist, Jocelyn Frawley, was white, and her on-campus interview was held on April 28, 2015. All members of the Search Committee, as well as the evaluators, were white.

At the time of her interview, Frawley had a Bachelor's Degree in Psychology and Public Management and Policy and was

---

[4] To wit: "[a]ssist the Director of Equal Opportunity/Title IX Coordinator in the development and implementation of training programs for faculty, staff, and students on equal opportunity, nondiscrimination, Title IX and other related topics"; "[e]valuate employee requests for reasonable accommodations"; and "[p]articipate in employee recruiting process to ensure equity in hiring."

[5] To wit: "[e]xperience in a higher education setting preferred, public higher education highly preferred"; "[e]xperience with affirmative action . . . , conducting mediations . . . , reasonable accommodation requests . . . , Title IX . . . , [and] the ADA"; and "[b]ackground in human resources, student affairs, or diversity programming."

[6] Specifically, the three other Black finalists were a Black woman, a Black man, and a Cape Verdean woman.

working towards a Master's Degree in Psychology (with her Master's thesis on the difference between men and women in consent communication in the Title IX context), which would be completed the following month (May 2015). Frawley's degrees favorably align with one of the job description's minimum qualifications. By way of work history, her résumé shows she worked as "Student Employee" at the University of Arizona Police Department from Spring 2012 to February 2015 assisting detectives with preliminary criminal rather than civil investigations on campus, including sexual assault and harassment cases. During that timeframe, Frawley was an undergraduate student at the University of Arizona for two of the three years she worked with the detectives and a graduate student there her third year. Then in February 2015, while still a graduate student, Frawley began working as Coordinator of Student Accountability at the University of Arizona's Dean of Students Office, where she investigated and adjudicated alleged university code of conduct violations. Frawley's employment references, while mostly positive, noted her "youth" as an "area[] of growth" and lack of "an extensive amount of experience."

As seen on her BSU interview evaluation forms, Frawley received mostly 5s, some 4s, and a couple of 3s. She was lauded for her presentation and received mostly positive feedback on her overall performance. In contrast, Taite received mostly 3s and 4s, some 2s, and some 5s. Taite's evaluators gave her some

positive feedback, but also raised some areas of concern.[7] We'll detail additional facts about the application process and interview performances later in the opinion. For now, we'll fast forward to the end of the application process.

After completing all the on-campus interviews, the Search Committee deliberated to select one finalist to hire. Frawley was the first choice of each Search Committee member and on May 19, 2015, BSU offered her the Position, which she accepted one week later. On June 12, 2015, DeBobes, via e-mail, informed Taite she was not selected for the Position, stating, "[a]lthough your credentials are commendable, we have selected another applicant whose qualifications were more appropriate for our present needs."

### B.    The Travel of the Case

Taite believed BSU failed to hire her for the Position because of her race and, proceeding pro se, brought a single claim of race discrimination that survived defendants' motion to dismiss. After BSU answered the amended complaint, the parties proceeded to discovery.

In due course, BSU filed a motion for summary judgment. In it, BSU articulated that the record evidence supported only one

---

[7] The record does not contain information about the qualifications, experience, and interview performances of the remaining Black finalists.

- 10 -

reasonable conclusion: BSU hired Frawley over Taite because she was the better qualified candidate. In BSU's own words, Frawley "performed the best" during the presentation and mock investigation and "also had more current relevant work experience," whereas Taite's "lack of recent experience in higher education and in Title IX established that she was not a good fit for the position at BSU." Taite opposed BSU's summary judgment motion contending just the opposite: what the record evidence demonstrated was a genuine dispute as to whether BSU's articulated reason for not choosing her was pretextual and racially motivated, and whether Frawley was more qualified than her.

On March 1, 2018, the magistrate judge (to whom the motion had been referred) issued a report and recommendation to allow BSU's motion for summary judgment. In sum, the magistrate judge found BSU had articulated a legitimate, nondiscriminatory reason for hiring Frawley over Taite and Taite had failed to prove BSU's articulated reason was pretextual and motivated by racial animus. The magistrate judge concluded: "[N]o reasonable fact-finder on this record could conclude that race was a motivating factor in BSU's decision to select Frawley."

Taite timely objected to the report,[8] protesting the magistrate judge's failure to view the record in the light most favorable to her, as was required, and failure to consider Taite's statement of disputed facts (which was part of her opposition to BSU's motion for summary judgment) and her affidavit (appended as an exhibit in support of said opposition).  On March 14, 2018, in a handwritten margin order, the district judge ruled:  "After a review of the objections and the record, I adopt the report and recommendation and allow [BSU's] motion for summary judgment."  Final judgment for BSU entered the following day.  Taite timely appealed and here we are.[9]

## II.  STANDARD OF REVIEW

We give a de novo look to the district court's grant of summary judgment, assessing the record ourselves in the light most favorable to the non-movant (Taite) and drawing all reasonable inferences in her favor.  See Gerald v. Univ. of P.R., 707 F.3d 7, 16 (1st Cir. 2013).  We affirm only if the record reveals "no

---

[8] Taite also raised objections to a couple of other procedural skirmishes that arose before the magistrate judge, but we do not address these objections as they are not relevant to this appeal.

[9] One final detour as we near the end of the road this case has traveled:  Taite began this appeal pro se and filed a pro se opening brief in which she raised numerous arguments.  Once she found counsel to represent her, counsel filed a supplemental brief that effectively superseded Taite's pro se brief and narrowed the issue before us:  whether the district court erred in granting summary judgment to BSU on Taite's claim of race discrimination.

- 12 -

genuine dispute as to any material fact and the movant [BSU] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence "is such that a reasonable jury could resolve the point in the favor of the non-moving party [Taite]," Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018) (citation omitted), and a fact is "material" if it "has the potential of affecting the outcome of the case," Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 25 (1st Cir. 2011) (citation omitted).  When determining if a genuine dispute of material fact exists, "we look to all of the record materials on file, including the pleadings, depositions, and affidavits" without evaluating "the credibility of witnesses []or weigh[ing] the evidence." Ahmed v. Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  We proceed with caution and restraint when considering summary judgment motions where, as here, issues of pretext, motive, and intent are in play. See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 167 (1st Cir. 1998).

## III. DISCUSSION

Contending here as she did below, Taite argues that BSU did not offer her the Position on account of her race in violation of Title VII, which prohibits employers from failing or refusing to hire or otherwise discriminating against any individual "with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. §2000e-

- 13 -

2(a)(1).  According to Taite, BSU's articulated reason for not hiring her was pretextual and racially motivated.  On that front, she asserts there are genuine issues of material fact in dispute precluding summary judgment for BSU and she thus asks us to reverse the district court's grant of summary judgment and remand for trial.  Countering that the district court committed no error, BSU asks us to affirm.

## A.    The **McDonnell Douglas** Framework

Because Taite does not allege there is evidence of direct discrimination, we, like the district court, apply the familiar three-step, burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for allegations of circumstantial evidence of discrimination.

### i.    Step One

At Step One, Taite has the burden to establish by a preponderance of the evidence a prima facie case of racial discrimination by showing:  (i) she's a member of a protected class; (ii) she was qualified for the Position; (iii) she applied to the Position and wasn't hired; and (iv) the Position was filled by someone with similar or inferior qualifications.  See Cruz v. Mattis, 861 F.3d 22, 25 (1st Cir. 2017) (applying the McDonnell Douglas framework in a claim of discriminatory hiring under Title VII).  Once established, she is entitled to an inference of

- 14 -

discrimination.  See Caraballo-Caraballo v. Corr. Admin., 892 F.3d 53, 57 (1st Cir. 2018).

### ii.  Step Two

Once a prima facie case is made then, at Step Two, the burden of production shifts to BSU to articulate a legitimate, nondiscriminatory reason for hiring Frawley instead of Taite.  See Cruz, 861 F.3d at 25.  BSU's articulated reason "must be one which, on its face, would justify a conclusion that" Taite was not hired "for a nondiscriminatory motive."  Brader v. Biogen Inc., 983 F.3d 39, 55 (1st Cir. 2020) (internal quotation marks and citation omitted).  If BSU articulates such a reason, "the McDonnell Douglas framework disappears and the sole remaining issue is discrimination vel non."  Id. (internal quotation marks and citation omitted).

### iii. Step Three

At Step Three, the burden of production shifts back to Taite[10] to show by a preponderance of the evidence, see Soto-Feliciano v. Villa Cofresí Hotels, Inc., 779 F.3d 19, 23 (1st Cir. 2015), that BSU's articulated reason for not hiring her is pretextual and that the actual reason is discriminatory, see Bonilla-Ramirez v. MVM, Inc., 904 F.3d 88, 94 (1st Cir. 2018).  A

---

[10] A quick pause to emphasize it is only the burden of production that shifts; the burden of persuasion remains with Taite the entire time.  See Caraballo-Caraballo, 892 F.3d at 57 n.4 (citation omitted).

plaintiff can "establish pretext by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could" rationally find them unworthy of credence and hence "infer that the employer did not act for the asserted [nondiscriminatory reasons]." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 56 (1st Cir. 2000) (internal quotation marks and citation omitted). Moreover, to establish pretext, "[t]here are many veins of circumstantial evidence that may be mined" as "courts will look at evidence of discrimination not in splendid isolation, but as part of an aggregate package of proof offered by the plaintiff." Mesnick v. Gen. Elec., 950 F.2d 816, 824 (1st Cir. 1991) (citation omitted). Ultimately, to survive summary judgment, Taite does not need to prove her case, see Adamson v. Walgreens Co., 750 F.3d 73, 79 (1st Cir. 2014), but instead, viewing the aggregate package of proof she offered, she "need only show that [her] ability to meet [her] burden turns on a genuine issue of material fact," Soto-Feliciano, 779 F.3d at 23. "For purposes of the summary judgment analysis, then, the question becomes whether a reasonable jury could find that . . . [BSU's] proffered reason is pretextual and that [Taite] was in fact . . . [not hired] because of [her] . . . race." Ahmed, 752 F.3d at 497; see also id. ("Stated otherwise, we must determine if there is a convincing mosaic of circumstantial evidence that would allow a

- 16 -

jury to infer intentional discrimination.") (internal quotation marks and citation omitted).

Taite argues that there are genuine material facts in dispute as to whether BSU's articulated reason for not hiring her was pretextual and whether racial discrimination was the real motivator. We now turn to address those issues, providing additional background facts as needed to supplement our discussion.

### B. The McDonnell Douglas Analysis

Below and before us, BSU conceded for purposes of summary judgment that Taite established a prima facie case of racial discrimination at Step One. Like the district court, we proceed to Step Two.

Taite claims BSU fails to meet its Step Two burden. She contends that the record evidence, when viewed in a light most favorably to Taite and discounting BSU's conclusory and self-serving statements, compels a finding that BSU has not articulated a legitimate, nondiscriminatory reason for hiring Frawley. Taite calls BSU's articulated reason for hiring Frawley -- because "they believed [she] was more qualified and better suited to the [P]osition" -- mere pretext for discrimination because, amongst other reasons, Frawley objectively failed to meet both the required and preferred qualifications for the job. Rather than decide who has the better Step Two argument, we assume for purposes of

analysis that BSU has articulated a neutral, nondiscriminatory reason for selecting Frawley and proceed to the Step Three question of whether Taite's evidence of pretext and animus are adequate. We do so because in the end, we agree Taite has raised trial-worthy issues which preclude the grant of summary judgment in BSU's favor.

### i. Pretext

**Differences in Application of Interview Criteria & Consequent Differences in Evaluation**

At Step Three, Taite says ample evidence exists which would allow a reasonable jury to conclude BSU failed to hire her for a racially discriminatory reason. In support of her claim, Taite highlights several pieces of evidence of BSU's disparate treatment,[11] one of which we find compelling: the marked difference in the way BSU evaluated the applicants' oral presentations and mock investigation demonstrations during the campus interview. Remember, the evaluators had been given the same evaluation form to assess all of the finalists. But Taite says BSU deviated from its own review process when it judged her. In defending its hiring decision, BSU asserts that, unlike Frawley, Taite was unfamiliar with certain Title IX procedures because she did not discuss

---

[11] For instance, Taite argues Frawley was not qualified so BSU could not have selected her because of her professional background. As Taite sees it, Frawley's experiences did not match the required or preferred competencies sought by the school in its job posting. But given our holding, we need not address this argument.

retaliation, which Title IX prohibits, during the mock investigation. According to DeBobes' affidavit, submitted in support of BSU's motion for summary judgment: "[I]t was evident from her mock interview that [Taite] was not familiar with some Title IX requirements. She failed to mention to either the student or the professor that retaliation is prohibited."

The record shows, and Taite concedes, she did not discuss retaliation. The record also shows Taite was specifically instructed that she did not need to do so. Three days before her interview, Taite received an e-mail from Samantha Campbell, Administrative Assistant for BSU's Office of Equal Opportunity -- the same office run by DeBobes. Campbell, who is white, was also one of the evaluators invited to observe the on-campus interviews. Campbell's e-mail to Taite included an attachment with instructions for the presentation portion of the interview. According to Campbell's instructions to Taite: (1) the assigned presentation topic was "[a]n introduction to discrimination and discriminatory harassment on the basis of race and national origin"; (2) Taite did "not need to cover retaliation"; (3) Taite did "not need to tie [her presentation] into [BSU]'s policies, procedures, or definitions" because BSU "will tell the audience that the presentation is not tied into the [U]niversity's policies"; and (4) Taite "may use presentation software (such as [PowerPoint], Prezi, etc.) or not, as [she] prefer[red]." There

is no evidence in the record that Campbell similarly instructed Frawley. In Taite's affidavit submitted in opposition to BSU's motion for summary judgment, Taite reiterated the instructions she received from Campbell, pointing to them as the reasons she structured her presentation as she did. Moreover, according to Taite's affidavit, no one read aloud the instructions she had been given, particularly, "no one told the audience members at the beginning of my PowerPoint presentation . . . that it was not tied to any Bridgewater State University policies, procedures or definitions as stated in the email from Samantha Campbell."[12]

After following Campbell's instructions, Taite subsequently received lower scores on her evaluation forms. One evaluator who gave Taite 2s, 3s, and 4s in the category "Presentation and Delivery"[13] noted that Taite "[d]idn't speak about retaliation." Another evaluator who also gave Taite 2s, 3s, and 4s in the same category on the evaluation form noted that

---

[12] Taite says Campbell was not present for her campus interview; DeBobes says she was.

[13] The "Presentation and Delivery" category consisted of the following questions:

> Did the presenter speak clearly and at the right pace? Was the speaker enthusiastic? Was eye contact maintained? Did the speaker use notes excessively? Did the speaker seem to know what he/she was talking about? Did the speaker have any disturbing distractions or mannerisms? Did you find the speaker interesting? Did you understand everything that the speaker presented?

Taite's presentation was "missing a few protected class[es]" and that Taite "specified just federal law."[14]

In contrast, Frawley scored almost all 5s in the same category of "Presentation and Delivery." Frawley's presentation drew praise from the evaluators for the same reasons Taite's presentation drew concerns from those same evaluators. Frawley received praise for discussing retaliation: "Excellent interview - Retaliation - interim measures - confidentiality protocol," "Noted the retaliation policy," and "Retaliation policy, 'promised' to protect." Frawley also received praise for her knowledge of the material: "Knowledgeable" and "Well researched material." Frawley received additional kudos for making her presentation applicable to BSU: "Referenced BSU + Massachusetts information." DeBobes' affidavit stated that Frawley "made the presentation applicable to BSU" and her "presentation was the best of the entire group." The record shows two of Frawley's evaluation forms had no names. One of the unnamed forms was by far the most positive form Frawley received. A reasonable jury could infer Campbell prepared this glowing evaluation form for Frawley.

---

[14] We point out that Massachusetts law largely follows federal law. See generally Theidon v. Harvard Univ., 948 F.3d 477, 505 (1st Cir. 2020) (stating "Massachusetts law also makes use of the McDonnell Douglas burden-shifting framework" but noting Massachusetts' more permissive summary judgment standard in discrimination cases). Effectively, that would mean Taite's presentation discussing federal law would cover Massachusetts law too.

Because Frawley discussed the same topics Taite was instructed she did not need to discuss, a reasonable jury could conclude BSU did not give Frawley the same instructions as Taite. On a related note, because the evaluators praised Frawley for the very reasons they criticized Taite, a reasonable jury could also conclude BSU did not tell the evaluators that Taite and Frawley received different sets of instructions. Moreover, a reasonable jury could conclude that since Campbell worked for DeBobes in the Office of Equal Opportunity and none of the evaluators (other than Campbell) knew about the different set of pre-interview instructions, the hiring process was arguably rigged by the Office of Equal Opportunity in favor of Frawley.

As Taite points out, BSU weighed the presentations and mock investigations "heavily" in its hiring decision, so having a fair across-the-board process mattered. To that point, we have said before that "[e]vidence that [the employer] 'deviated from its standard procedure or policies in taking an adverse employment action against [a plaintiff] may be relevant to the pretext inquiry.'" Theidon v. Harvard Univ., 948 F.3d 477, 499 (1st Cir. 2020) (quoting Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 50 (1st Cir. 2019)). "'The rationale is that if an employer has a policy or procedure that governs a specific situation but fails to adhere to the same in taking an adverse employment action . . . , then it might be inferred that the reason articulated for

taking the adverse employment action against the employee was not true.'" Id. (ellipsis in original) (quoting Rodríguez-Cardi, 936 F.3d at 50). Taite points to evidence demonstrating she was penalized for not discussing retaliation or tailoring her presentation to BSU as so instructed by Campbell, whereas Frawley was rewarded for doing just the opposite. Had BSU followed its own procedure, Taite argues the differences in her interview performance compared to Frawley's were not so drastic as to make Frawley the only clear choice.

With that, Taite has pointed to irregularities in the interview process. Viewing the evidence in the light most favorable to Taite and drawing reasonable inferences in her favor as we must, see Gerald, 707 F.3d at 16, we find that a reasonable jury could conclude BSU's reason for choosing Frawley over Taite was pretextual. This is especially so because, again, BSU weighed the presentations and mock investigations "heavily" in its hiring decision.

### ii. Animus

Because a reasonable jury would also need to conclude BSU's actual reason for not hiring Taite was discriminatory, see Bonilla-Ramirez, 904 F.3d at 94, we now turn to discuss discriminatory animus. We keep our discussion brief because "[t]he same evidence used to show pretext can support a finding of discriminatory animus if it enables a factfinder 'reasonably to

- 23 -

infer that unlawful discrimination was a determinative factor in the adverse employment action.'" Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 6 (1st Cir. 2000) (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 57 (1st Cir. 1999)).

On this record, there is sufficient evidence from which a reasonable jury could infer discriminatory animus. As discussed, BSU gave Taite (who is Black) a distinct set of instructions from Frawley (who is white). Then, when Taite followed them, BSU penalized her. Moreover, BSU invited four Black finalists but hired the only white finalist, who, in turn, arguably had less experience than at least one Black finalist (Taite).

After reviewing the evidence in the light most favorable to Taite, see Gerald, 707 F.3d at 16, for the reasons we've explained above there is adequate evidence for a reasonable jury to find Taite has carried her burden at Step Three, see Ahmed, 752 F.3d at 503 ("[S]ufficient evidence to support a finding of pretext, in combination with the plaintiff's prima facie showing, can suffice at times to raise an inference of discrimination that will defeat summary judgment."); see also LeBlanc v. Great American Ins. Co., 6 F.3d 836, 843 (1st Cir. 1993) (noting evidence of pretext, "coupled with the elements of the employee's prima facie case . . . may . . . lead the factfinder to infer that the employer has engaged in intentional discrimination") (citation omitted).

To be clear, our conclusion is constrained by our standard of review; we refrain from making credibility determinations because that is the province of the jury.  See Ahmed, 752 F.3d at 495.  At this summary judgment stage, however, Taite's aggregate package of proof suffices to survive BSU's motion for summary judgment.  See Gerald, 707 F.3d at 16 ("Summary judgment is not appropriate where the evidence on record is sufficiently open-ended to permit a rational fact finder to resolve the issue in favor of either side.") (internal quotation marks and citation omitted).

## IV.  CONCLUSION

We **vacate** the district court's grant of summary judgment and **remand** for further proceedings consistent with this opinion. Costs to Appellant.